not to award attorney fees, particularly where that ruling was premised on the county court's erroneous conclusion that Kim had failed to prove a breach of trust. But we hesitate to award fees ourselves, because we are reviewing a cold record and the county court oversaw the litigation. The county court is thus in the best position to determine, in light of our disposition of the merits of this appeal, whether "justice and equity" require attorney fees, and in what amount. We reverse, and remand for the court to do so.

## CONCLUSION

We agree with the Court of Appeals' general legal framework and ultimate conclusion that the trustee's breach was harmless. We disagree, however, with the Court of Appeals' conclusion that annual schedule K-1 tax reports were sufficient to reasonably inform beneficiaries of the trust and its administration. And we conclude that the county court should revisit the issue of attorney fees in light of our disposition of the merits of this appeal.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS
ON THE ISSUE OF ATTORNEY FEES.

WRIGHT, J., not participating.

---

PERRY ELTING ET AL., APPELLEES, V.
KERWIN ELTING, APPELLANT.
___ N.W.2d ___

Filed June 27, 2014.    No. S-13-551.

1. **Trial: Witnesses.** In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony.
2. **Judgments: Appeal and Error.** In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.
3. ____: ____. In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong.

4. **Actions: Pleadings: Equity.** The nature of an action, whether legal or equitable, is determinable from its main object, as disclosed by the averments of the pleadings and the relief sought.
5. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court resolves questions of law and fact independently of the trial court's determinations.
6. **Breach of Contract: Damages.** A suit for damages arising from breach of a contract presents an action at law.
7. **Principal and Agent.** Actual authority is authority that the principal expressly grants to the agent or authority to which the principal consents.
8. ____. The scope of an agent's authority is a question of fact.
9. **Ratification: Agents.** Ratification of an agent's unauthorized acts may be made by overt action or inferred from silence and inaction.
10. ____: ____. Retention of benefits secured by an agent's unauthorized act with knowledge of the source of such benefits and the means by which they were obtained is a ratification of the agent's act.
11. **Ratification.** Whether there has been a ratification is ultimately and ordinarily a question of fact.
12. **Ratification: Proof.** Because ratification is an affirmative defense, the burden of proving ratification rests on the party alleging the defense.

Appeal from the District Court for Nuckolls County: Vicky L. Johnson, Judge. Affirmed.

Daniel E. Klaus and Sheila A. Bentzen, of Rembolt Ludtke, L.L.P., for appellant.

Steven E. Guenzel and Cameron E. Guenzel, of Johnson, Flodman, Guenzel & Wedger, for appellees.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Miller-Lerman, J.
## NATURE OF CASE
Glenn Elting and Sons was a family farming partnership that was formed in 1976 among Glenn Elting and his sons, Kerwin Elting and Perry Elting, all as managing partners. The partners who comprised the partnership changed over the years. The managing partners during the time period relevant to the issues in this case were: Kerwin; Perry; Kerwin's son, Carl Elting; and Perry's son, Knud Elting. On March 30, 2011, Perry, Knud, and Perry's wife, ReJean Elting, the appellees, filed this action in the district court for Nuckolls County

against Kerwin, the appellant. The amended complaint was filed on January 22, 2013. The appellees alleged that Kerwin had entered into a series of grain contracts on behalf of the partnership without the authority to do so, resulting in significant losses to the partnership. The appellees sought damages based on these losses.

After a bench trial, the district court filed its order on May 30, 2013, in which it found in favor of the appellees. The district court determined that Kerwin did not have authority to enter into the contracts and that his actions were not ratified. The district court further determined that Kerwin was not shielded by the limitation of liability clause contained in the controlling partnership agreement. The district court awarded judgment in favor of the appellees in the amount of $1,072,175 plus prejudgment interest. Kerwin appeals. Finding no error, we affirm.

## STATEMENT OF FACTS

In 1976, Glenn Elting and Sons, a farming partnership, was formed among Glenn and his two sons, Kerwin and Perry. The partnership was later expanded and included as partners Glenn's wife, Esther Elting; Kerwin's wife, Patricia Elting; and Perry's wife, ReJean Elting; however, the management of the partnership remained with Glenn, Kerwin, and Perry.

The partnership had an established decisionmaking process: The managing partners would have informal discussions regarding whether and how to proceed, and once a consensus was reached, the partners would proceed. No documents recorded the discussions or decisions of the managing partners. Once a decision was made, Glenn, and later Kerwin, was responsible for carrying out the decision, including signing contracts on the partnership's behalf.

On January 31, 2005, the partners entered into the "Amended and Restated Partnership Agreement for Glenn Elting and Sons" (Partnership Agreement). The Partnership Agreement did not change how the partnership made decisions. Paragraph 5.1 of the Partnership Agreement provided that the partnership was to be managed by the managing partners, and paragraph 5.2 provided that the managing partners were Glenn, Kerwin,

and Perry. Paragraph 5.3 provided that at any time there were more than two managing partners, "the approval of a majority of the Managing Partners shall be required for the Managing Partners to act on behalf of the Partnership, unless unanimous approval of the Managing Partners is required for such action by another provision of [the Partnership] Agreement." Paragraph 5.4 of the Partnership Agreement contained a limitation of liability clause, which provided:

> Liability of Managing Partners. No Managing Partner shall be liable to the Partnership or to any other Partner for any action taken in good faith and reasonably believed by such Managing Partner to be in the best interest of the Partnership or taken in reliance on the provisions of [the Partnership] Agreement, or for good faith errors of judgment, but shall only be liable for willful misconduct or gross negligence in the performance of his or her duties.

In 2008, Kerwin's son, Carl, and Perry's son, Knud, joined the partnership and became additional managing partners. At this point, the managing partners were Kerwin, Perry, Carl, and Knud. On February 8, 2008, the partners entered into the "First Amendment to Amended and Restated Partnership Agreement for Glenn Elting and Sons" to reflect this change. This amendment to the Partnership Agreement did not change any other provisions of the Partnership Agreement regarding how decisions were made. When this amendment to the Partnership Agreement was signed, Glenn and Esther were no longer partners, and they are not involved in this appeal. As noted, the managing partners in 2008 thus were Kerwin, Perry, Carl, and Knud. Kerwin's wife, Patty, and Perry's wife, ReJean, remained as partners, but they did not have a significant role in managing the partnership.

In December 2008, Knud withdrew from active participation in the partnership and ceased his day-to-day involvement in the partnership's activities. However, Knud's status as a managing partner remained unchanged. Kerwin, Perry, and Carl continued to make the decisions involving the partnership.

In 2007, prior to the time that Carl and Knud became partners, the partnership had entered into hedge contracts with

Cargill, Inc., and Aurora Cooperative to sell all of the partnership's anticipated corn production for the years 2008, 2009, and 2010. The partnership contracted to sell approximately half of its corn production to Cargill and the other half to Aurora Cooperative. It is undisputed that the initial hedge contracts with Cargill and Aurora Cooperative were entered into with the knowledge and consent of the managing partners at the time, Glenn, Kerwin, and Perry.

In approximately 2008, Cargill began offering a product called a focal point contract. The focal point contract allowed a farmer to "unlock" the price of hedged corn and allow it to float with the market based upon the increase or decrease in the market between the opening and closing dates specified in the focal point contract. The focal point contract generally was an amendment to the original hedge contract. If the market moved up and the price per bushel increased between the opening and closing dates, then the increased amount would be added to the price per bushel agreed to in the original hedge contract, minus a service fee of 3 cents per bushel. If the price per bushel decreased between the opening and closing dates, then the decreased amount, plus the 3-cent service fee, would be subtracted from the price per bushel agreed to in the original hedge contract. Because all the focal point contracts assessed the same 3-cent fee per bushel, a farmer entering into the focal point contract was predicting and hoping that the market would move up at least 3 cents per bushel during the time that the contract was open in order to maintain at least the same return as would have obtained on the original hedge contract after the payment of service fees.

In 2008 and 2009, Kerwin entered into a series of focal point contracts with Cargill on behalf of the partnership (Focal Point contracts). Cargill's local representative had in-person and telephone conversations with Kerwin regarding the Focal Point contracts. Kerwin entered into the Focal Point contracts on behalf of the partnership at three times. The first set of contracts opened with 240,000 bushels on May 2, 2008, and closed on May 8. The second set of contracts opened with 1,750,000 bushels on September 8 and 26, 2008, and closed on September 12 and October 7, respectively. The third set of

contracts opened on June 23, 2009, and closed on July 1. As a result of the first set of Focal Point contracts, the partnership gained $23,400. As a result of the second and third sets of contracts, the partnership lost significant money. In total, the partnership lost $2,144,350 on the three sets of Focal Point contracts from the originally contracted price.

Sometime in late 2008 or early 2009, Kerwin and Perry started having discussions with respect to dissolving the partnership. A "Partnership Separation Agreement" had been signed on February 8, 2008, which was the same date that the amendment to the Partnership Agreement changing membership was signed. On April 27, 2009, Kerwin, Patricia, and Carl signed a separation notice stating that they wished to dissolve the partnership in accordance with the partnership separation agreement. According to the findings of the district court, the performance of the first two sets of Focal Point contracts did not affect the decision to dissolve the partnership.

Before the partnership dissolved, in late 2007 or early 2008, the partnership began banking with the First National Bank of Fairbury (FNB). The partnership worked primarily with Dick Hoppe, a senior vice president and senior agriculture loan specialist. The partnership's primary purpose of banking with FNB was to secure an operating note, which operated as a line of credit to secure the year's farming expenses. Before agreeing to lend the partnership money, Hoppe needed to review the partnership's financial information. Kerwin was primarily responsible for compiling the information. Kerwin provided Hoppe with the raw data, and Hoppe prepared a balance sheet and cashflow projections. FNB determined that the partnership was creditworthy, and the banking relationship began in January 2008. The 2007 balance sheet was signed by Glenn, Perry, and Kerwin, who were the managing partners at that time.

On January 9, 2009, Hoppe met with Kerwin, Carl, Perry, and ReJean for their annual meeting to review the partnership's financial information, including the 2008 balance sheet and cashflow projections for 2009, in order to renew the partnership's line of credit. At that meeting, Kerwin, Perry, and

Carl each signed the 2008 balance sheet for the partnership. Immediately above their signatures, the balance sheet stated:

> For the purpose of securing credit from time to time this statement is furnished and is certified to be true and correct. I (or We) agree to notify the bank promptly of any material change herein. . . . False statement may be subject to prosecution under Title 18 of the US Code. I (or We) have read the above statement before signing . . . .

The 2008 balance sheet, as well as the cashflow projections for the upcoming 2009 crop year, reflected the price of the Cargill corn after the gains from the May 2008 Focal Point contracts and the losses from the September 2008 Focal Point contracts. There is dispute as to how specific the review of the partnership's financial information was during the annual meetings with Hoppe, including the January 2009 meeting.

After the proceedings to dissolve the partnership began, Kerwin and Carl began farming together and Perry and Knud began farming together. Once the partnership stopped farming, Kerwin and Perry needed to establish separate relationships with FNB. To do so, they each needed to provide FNB with financial information to show that they were creditworthy.

When Perry and Knud began the preparation of their balance sheets and cashflow projections for 2010, they called various vendors to obtain input costs. They also called the Cargill elevator to determine their contract grain price, and the numbers they were provided were apparently based on the price in the original hedge contracts from 2008 and did not include adjustments due to the Focal Point contracts. Knud provided this information to Hoppe, who then completed the balance sheet.

In Hoppe's review of Perry and Knud's financial information, he noticed that Perry and Knud's numbers differed from Kerwin and Carl's numbers with respect to the price of the contracted corn. The Focal Point contracts with Cargill had been divided evenly between Kerwin and Perry in the dissolution documents, so the numbers should have matched. Kerwin's numbers reflected the prices that had been adjusted due to the Focal Point contracts, whereas Perry's did not.

Hoppe informed Perry and Knud that their financial numbers did not match Kerwin and Carl's. Perry and Knud testified that this is the first time they learned of the Focal Point contracts.

On March 30, 2011, the appellees filed their complaint in the district court against Kerwin, seeking $867,000 in damages, which represented their understanding of their portion of the total partnership losses from the Focal Point contracts. The appellees alleged that Perry and Knud had not been consulted regarding whether the partnership should enter into the Focal Point contracts, that they had never voted to enter into the Focal Point contracts, and that Kerwin lacked authority to enter into the Focal Point contracts on behalf of the partnership.

On January 14, 2013, the appellees moved to amend their complaint, because they learned through discovery documents that there were other Focal Point contracts that Kerwin had entered into on behalf of the partnership of which the appellees were unaware. Based on these other Focal Point contracts, the appellees alleged that they were entitled to an additional $226,525, which represented their share of the losses resulting from these additional Focal Point contracts. The district court granted the appellees' motion to amend their complaint.

In response to the appellees' complaint and amended complaint, Kerwin alleged in his answer that he had received authorization to enter into the Focal Point contracts on behalf of the partnership and that even if he lacked such authority, the appellees had ratified his actions. Kerwin further alleged that he was shielded from any liability by the limitation of liability clause in the Partnership Agreement. He also alleged that the appellees' additional claims in their amended complaint were barred by the statute of limitations.

A bench trial was held on January 29 and 30, 2013. The appellees called three witnesses, including Perry, Knud, and the Cargill representative. Portions of Kerwin's deposition were also read into the record. The appellees offered and the court received seven exhibits, including: the Partnership Agreement, the first amendment to the Partnership Agreement,

purchase contracts with Cargill, and the Focal Point contracts with Cargill. Kerwin called three additional witnesses, including Kerwin, Hoppe, and Carl. Kerwin offered, and the court received, 24 exhibits, including: the partnership separation agreement; Hoppe's notes regarding meetings with the partners; the partnership's financial information, including balance sheets and projected cashflow statements; and contracts between the partnership and Aurora Cooperative.

At trial, Kerwin and Carl generally testified that they were familiar with the Focal Point contracts, and that the contracts were entered into after all the managing partners—Kerwin, Perry, Knud, and Carl—had fully discussed the matter and had come to a consensus that all partners wanted to enter into the Focal Point contracts. In contrast, Perry and Knud generally testified that they were not aware of the Focal Point contracts prior to the partnership's entering into them and that they had not authorized Kerwin to enter into them on behalf of the partnership.

After the bench trial, on May 30, 2013, the court filed its order in which it determined that Kerwin lacked authority to enter into the Focal Point contracts on behalf of the partnership; that Kerwin's actions had not been ratified; and that because Kerwin lacked authority, he was not shielded from liability by the limitation of liability provision in the Partnership Agreement. The court found Kerwin liable to the appellees for $1,072,175 plus prejudgment interest.

Kerwin appeals.

## ASSIGNMENTS OF ERROR

Kerwin claims on appeal that the district court erred when it (1) found that Kerwin did not have authority to enter into the Focal Point contracts on behalf of the partnership, (2) found that the other managing partners did not ratify Kerwin's actions in entering into the Focal Point contracts, (3) found that the limitation of liability clause did not shield Kerwin from liability, and (4) awarded prejudgment interest to the appellees. Because the fourth assignment of error is not argued in Kerwin's brief, we do not consider it. See *C.E. v. Prairie Fields Family Medicine*, 287 Neb. 667, 844 N.W.2d 56 (2014).

## STANDARDS OF REVIEW

[1-3] In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Liljestrand v. Dell Enters.*, 287 Neb. 242, 842 N.W.2d 575 (2014). In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Hooper v. Freedom Fin. Group*, 280 Neb. 111, 784 N.W.2d 437 (2010). See, also, *Black v. Brooks*, 285 Neb. 440, 827 N.W.2d 256 (2013). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Black v. Brooks, supra.*

## ANALYSIS

The legal framework for our analysis is Nebraska's Uniform Partnership Act of 1998 (1998 UPA), found at Neb. Rev. Stat. §§ 67-401 to 67-467 (Reissue 2009), as well as the terms of the Partnership Agreement. The 1998 UPA is Nebraska's counterpart to the model act known as the Revised Uniform Partnership Act (RUPA). See, *Robertson v. Jacobs Cattle Co.*, 285 Neb. 859, 830 N.W.2d 191 (2013); *Shoemaker v. Shoemaker*, 275 Neb. 112, 745 N.W.2d 299 (2008). After January 1, 2001, the 1998 UPA became applicable to any Nebraska partnership, including those partnerships formed prior to January 1, 1998. See §§ 67-464 and 67-467. It is not disputed that the 1998 UPA applies to this case.

[4] As an initial matter, we must determine the nature of the action brought by the appellees, because the nature of the action will determine our standard of review. Under § 67-425(2)(a) of the 1998 UPA, a partner may maintain an action against another partner for legal or equitable relief. The nature of an action, whether legal or equitable, is determinable from its main object, as disclosed by the averments of the pleadings and the relief sought. *Genetti v. Caterpillar, Inc.*, 261 Neb. 98, 621 N.W.2d 529 (2001).

[5] Kerwin contends that because this case involves an action among partners, it is necessarily an action in equity rather than an action at law and that our standard of review should be de novo on the record. Kerwin refers us to cases such as *Robertson v. Jacobs Cattle Co., supra*, involving an action for a partnership dissolution and accounting between partners which we deemed as one in equity and properly reviewed de novo on the record. In *Robertson*, we noted that on appeal from an equity action, an appellate court resolves questions of law and fact independently of the trial court's determinations.

[6] Kerwin's characterization of this case as an action in equity does not accurately assess the substance of the appellees' claim. In this case, the appellees alleged that Kerwin breached the Partnership Agreement, a contract, and sought damages. The appellees did not request an accounting nor did they seek to dissolve the partnership. We have stated that a suit for damages arising from breach of a contract presents an action at law. *Thomas & Thomas Court Reporters v. Switzer*, 283 Neb. 19, 810 N.W.2d 677 (2012). Because this is a suit for damages arising from breach of the Partnership Agreement, the action is one at law, and we apply the applicable standards of review recited earlier in this opinion. In this regard, we repeat that the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong and add that an appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error. *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013). With the foregoing framework and standard of review in mind, we turn to Kerwin's assignments of error and in so doing, refer at length to the district court's detailed findings and opinion.

*Kerwin Was Not Authorized by the*
*Partnership to Enter Into the*
*Focal Point Contracts.*

In Kerwin's first assignment of error, he claims that the district court erred when it determined that Kerwin did not

have authority to enter into the Focal Point contracts on behalf of the partnership. We find no merit to this assignment of error.

[7,8] With respect to a partner's agency to act on behalf of a partnership, § 67-413(1) of the 1998 UPA provides that "[e]ach partner is an agent of the partnership for the purpose of its business." Because each partner is an agent of the partnership, the partner must have authority in order to act on behalf of the partnership. We have stated that "[a]ctual authority is authority that the principal expressly grants to the agent or authority to which the principal consents." *Koricic v. Beverly Enters. - Neb.*, 278 Neb. 713, 717, 773 N.W.2d 145, 150 (2009). See, also, Restatement (Third) of Agency § 2.01, comment *c*. at 81 (2006) (stating that "[a]ctual authority is a consequence of a principal's expressive conduct toward an agent, through which the principal manifests assent to be affected by the agent's action, and the agent's reasonable understanding of the principal's manifestation"). The scope of an agent's authority is a question of fact. *Koricic v. Beverly Enters. - Neb.*, supra.

The Partnership Agreement in this case contains language regarding the partners' authority to act on behalf of the partnership. Paragraph 5.1 of the Partnership Agreement provides that the management of the partnership is vested in the managing partners. At all relevant times, the four managing partners were Kerwin, Perry, Carl, and Knud. Paragraph 5.1 further provides that the managing partners "shall have power and authority to manage all business and affairs of the Partnership, which power and authority shall include, but is not limited to . . . entering into and terminating lease agreements and other contracts." Paragraph 5.3 states in part that "[a]t any time in which there are more than two (2) Managing Partners, the approval of a majority of the Managing Partners shall be required for the Managing Partners to act on behalf of the Partnership . . . ."

Pursuant to the language of the Partnership Agreement, approval of at least three of the four managing partners was required in order for Kerwin to have had authority to act on behalf of the partnership and to enter the partnership into

the Focal Point contracts. For completeness, we note that the record indicates that in the course of the conduct of the partnership's affairs, some incidental decisions, such as getting a tire fixed, were not viewed as requiring the approval of a majority of the managing partners. However, it is undisputed that entering into the Focal Point contracts was viewed as a significant decision, and it naturally follows that such decision required approval of a majority of the managing partners as provided in paragraph 5.3 of the Partnership Agreement.

At the bench trial, evidence was adduced regarding whether Kerwin was authorized to enter into the Focal Point contracts on the partnership's behalf. The partners agree that Kerwin was generally responsible for handling the paperwork of the partnership, including the signing of contracts on behalf of the partnership. Kerwin and Carl both testified that the managing partners discussed and agreed that the partnership should enter into the Focal Point contracts. In contrast, Perry and Knud both testified that they were unaware of the Focal Point contracts prior to the time the partnership entered into them. Perry and Knud testified that the managing partners never discussed entering into the Focal Point contracts and that they never agreed to authorize Kerwin to enter into them on behalf of the partnership.

In its order, the district court delineated a number of factors it considered in making its finding that Perry and Knud did not authorize Kerwin to enter the partnership into the Focal Point contracts. The district court evaluated the credibility of the witnesses and found Perry and Knud to be credible. As stated above, in a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Liljestrand v. Dell Enters.*, 287 Neb. 242, 842 N.W.2d 575 (2014). We generally defer to a trial court's assessment of conflicting evidence, because the trial court had the advantage of hearing and observing important parts of evidence that are not readily apparent from a cold record. *Id*. The court stated that it considered the fact that after it was decided that the partnership would be dissolved and the families had agreed to begin farming separately, Perry and Knud prepared their separate 2010 financial information

for FNB without adjusting the price of corn for the losses due to the Focal Point contracts. In this regard, the court noted "the consternation which erupted once it became known that Perry and Kerwin were presenting corn prices to [FNB] which should have matched, but did not." Also in support of its decision finding Perry and Knud more credible was the fact that when filing their original complaint, the appellees omitted some of the Focal Point contracts entered into in 2008, of which they were apparently unaware of until discovery took place prior to trial.

In support of its findings, the court further stated that

[i]t has considered that if all four [managing] partners were aware of the opening up of the [Focal Point] contracts, and watched the spectacular drops in the value of their corn crop, it would seem that someone would remember a specific, undoubtedly unpleasant conversation, between [sic] the partners regarding the ultimate decisions to close the [Focal Point] contracts. One would also think that such an incredible loss in corn contract prices would have been cited as a reason to end the partnership, but it was not. [The court] has considered the fact that the last group of Focal Point contracts were [sic] apparently entered into after the parties had agreed to dissolve the partnership and go their separate ways. It does not seem plausible that partners whose business relationship had reached to the point of dissolution a few short weeks or months earlier would agree to open up additional contracts with another potential for significant loss.

The district court added that it "considered the demeanor, conduct, testimony, statements in conflict between witnesses, and conflicts within the witness's own testimony. It credits the version that Perry and Knud told and finds that they were unaware of the Focal Point contracts until Perry and Knud began their separate relationship with FNB." Given the foregoing, the district court found that Perry and Knud were unaware of the Focal Point contracts until after they were entered into and it found that Perry and Knud did not agree to enter the partnership into the Focal Point contracts. Therefore, the

district court found that Kerwin was not authorized to enter into the Focal Point contracts on the partnership's behalf.

As stated above, the scope of an agent's authority is a question of fact. *Koricic v. Beverly Enters. - Neb.*, 278 Neb. 713, 773 N.W.2d 145 (2009). The district court found that Perry and Knud did not agree to enter into the Focal Point contracts and that therefore, there was not approval by a majority of the managing partners to enter into the Focal Point contracts as was required by paragraph 5.3 of the Partnership Agreement. There is sufficient evidence to support these findings. The district court's finding that Kerwin did not have authority to enter the partnership into the Focal Point contracts was not clearly wrong.

*Kerwin's Actions of Entering the Partnership*
*Into the Focal Point Contracts*
*Were Not Ratified.*

In Kerwin's second assignment of error, he claims that the district court erred when it found that his actions were not ratified. Kerwin argues that even if he lacked authority to enter into the Focal Point contracts on behalf of the partnership, Perry and/or Knud nevertheless ratified his actions, and he is relieved of liability. We find no merit to this assignment of error.

[9-12] As we have noted above, "[e]ach partner is an agent of the partnership for the purpose of its business." § 67-413(1). Regarding ratification, § 4.01 of the Restatement (Third) of Agency (2006) provides in part:

> (1) Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.
>
> (2) A person ratifies an act by
>
> (a) manifesting assent that the act shall affect the person's legal relations, or
>
> (b) conduct that justifies a reasonable assumption that the person so consents.

*Id.* at 304. We have previously stated:

> Ratification of an agent's unauthorized acts may be made by overt action or inferred from silence and inaction.

Further, retention of benefits secured by an agent's unau-
thorized act with knowledge of the source of such ben-
efits and the means by which they were obtained is a
ratification of the agent's act. And whether there has been
a ratification is ultimately and ordinarily a question of
fact. Because ratification is an affirmative defense, the
burden of proving ratification rest[s] on the [party alleg-
ing the defense].

*Brook Valley Ltd. Part. v. Mutual of Omaha Bank*, 285 Neb.
157, 168-69, 825 N.W.2d 779, 789 (2013). In this case,
Kerwin affirmatively pled ratification in his "Third Affirmative
Defense" and therefore, Kerwin had the burden to show that
his actions were ratified. The district court found that they
were not.

In order for a previously unauthorized act to be ratified, the
ratifying partners must have actual knowledge of the unau-
thorized act before they can ratify the action. Section 4.06
of the Restatement provides that "[a] person is not bound
by a ratification made without knowledge of material facts
involved in the original act when the person was unaware of
such lack of knowledge." *Id.* at 336. Comment *b.* to § 4.06
further explains:

A person who has ratified is not bound by the ratification
if it was made without knowledge of material facts about
the act of the agent or other actor. Thus, ratification con-
cerns actions that have already taken place, of which the
person is aware, not actions or events that may occur in
the future. The burden of establishing that a ratification
was made with knowledge is on the party attempting to
establish that ratification occurred.

*Id.* at 336.

Comment *b.* to § 4.06 at 336 clarifies the nature of the
knowledge needed for ratification, providing that "[r]atification
requires that the principal have actual knowledge of material
facts, not notice as defined in § 1.04(4)." The definition of
notice in § 1.04(4) of the Restatement includes constructive
knowledge, and states in part that "[a] person has notice of a
fact if the person knows the fact, has reason to know the fact,
has received an effective notification of the fact, or should

know the fact to fulfill a duty owed to another person." *Id*. at 70. Therefore, the Restatement (Third) of Agency makes it clear that the ratifying partners must have actual knowledge, not merely constructive knowledge, of the previously unauthorized act before they can ratify the act. Mere notice as defined in § 1.04(4) does not equate to knowledge for ratification purposes.

Kerwin argues that evidence of constructive knowledge on the part of the ratifying partners is sufficient for the other partners to have ratified a previously unauthorized act. He asserts that both Perry and Knud ratified the partnership's participation in the Focal Point contracts. In particular, he contends that Perry had constructive knowledge of the Focal Point contracts, because at the FNB meeting on January 9, 2009, Perry signed the first page of the 2008 balance sheet, and elsewhere in the document, the price of corn was adjusted for the Focal Point contracts. Kerwin contends that in signing the balance sheet, Perry indicated that he had read the entire document and was aware of its contents. Kerwin asserts that if Perry had had any questions or concerns regarding the price of the corn, he would have raised them at the FNB meeting. Kerwin further asserts that the Focal Point contracts were kept in an unlocked filing cabinet in the partnership's office and that the managing partners had access to them at any time and could have reviewed them.

We reject Kerwin's argument that constructive knowledge is sufficient for ratification in this case. None of the cases upon which Kerwin relies involved partners or a partnership ratifying the previously unauthorized act of another partner based upon constructive knowledge. By way of example, *Eicher v. Mid America Fin. Invest. Corp.*, 275 Neb. 462, 748 N.W.2d 1 (2008), involved whether a person who signed a contract for the sale of his home had constructive knowledge of the content contained in the contract. *Gonzalez v. Union Pacific RR. Co.*, 282 Neb. 47, 803 N.W.2d 424 (2011), involved whether a person who had signed a release of liability had constructive knowledge of the contents of the release. In the instant case, the 2008 balance sheet signed by

Perry has not been determined to be a contract, and it is not a release of liability, therefore, neither *Eicher* nor *Gonzalez* controls our analysis.

As noted above, the Restatement (Third) of Agency (2006) provides that actual knowledge, not constructive knowledge, is required for ratification, and we determine that this principle is applicable in this case. Whether there has been a ratification is ultimately and ordinarily a question of fact. *Brook Valley Ltd. Part. v. Mutual of Omaha Bank*, 285 Neb. 157, 825 N.W.2d 779 (2013). In the bench trial, both Perry and Knud testified and the court found that they were "adamant that they had no knowledge of the Focal Point contracts." In the district court's order, the court stated that it considered Perry's testimony that he trusted Kerwin "to do the book work" for the partnership and that "[i]t is clear that Perry is not a detail-oriented person." In weighing the testimony, the court stated that although "[t]here is some evidence that Perry, at a minimum, had the ability to notice that the contract price had changed on some of the corn," the district court found that Perry and Knud were credible witnesses and ultimately found that neither Perry nor Knud had actual knowledge of the Focal Point contracts for purposes of ratification.

Because actual knowledge of the Focal Point contracts was required in order for Perry or Knud to ratify Kerwin's decision to enter into them on behalf of the partnership, and because Perry and Knud lacked such actual knowledge, they could not, and did not, ratify Kerwin's decision to enter into the Focal Point contracts on the partnership's behalf. Given our standard of review, we cannot say that the district court was clearly wrong when it found that neither Perry nor Knud ratified Kerwin's actions.

*The Limitation of Liability Clause in the*
*Partnership Agreement Does Not*
*Shield Kerwin From Liability.*

In Kerwin's third assignment of error, he argues that the limitation of liability clause found in paragraph 5.4 of the Partnership Agreement shields him from liability for the losses

resulting from his unauthorized actions, and he claims that the district court erred in not so determining. We find no merit to this assignment of error.

Paragraph 5.4 of the Partnership Agreement states:

Liability of Managing Partners. No Managing Partner shall be liable to the Partnership or to any other Partner for any action taken in good faith and reasonably believed by such Managing Partner to be in the best interest of the Partnership or taken in reliance on the provisions of [the Partnership] Agreement, or for good faith errors of judgment, but shall only be liable for willful misconduct or gross negligence in the performance of his or her duties.

The 1998 UPA provides that the relations among the partners and between the partners and the partnership are generally governed by their partnership agreement. § 67-404(1). Under the 1998 UPA, a partnership agreement may place some limitations on the partners' duty of care, as is done in paragraph 5.4 of the Partnership Agreement, but it may not unreasonably reduce the duty of care in some scenarios. See, e.g., §§ 67-404(2)(d) and 67-424(3) (regarding conduct and winding up of partnership). See, also, § 67-433(2)(c) (regarding dissociation). Section 67-404 of the 1998 UPA provides in part:

(1) Except as otherwise provided in subsection (2) of this section, relations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, the [1998 UPA] governs relations among the partners and between the partners and the partnership.

The 1998 UPA is Nebraska's counterpart to the model act known as RUPA. Section 67-404 of the 1998 UPA is equivalent to § 103 of RUPA. Comment 6 to § 103 of RUPA states:

[P]artnership agreements frequently contain provisions releasing a partner from liability for actions taken in good faith and in the honest belief that the actions are in the best interests of the partnership and indemnifying the partner against any liability incurred in connection with

the business of the partnership if the partner acts in a good faith belief that *he has authority to act*.

Robert W. Hillman et al., The Revised Uniform Partnership Act § 103, comment 6 at 44 (2013-14 ed. 2013) (emphasis supplied).

In this case, the district court determined that because Kerwin's actions in entering into the Focal Point contracts were not authorized by the partnership, his actions were not shielded by the limitation of liability clause. The district court reasoned that "[a]s Kerwin had no right to bind [the partnership] to the Focal Point contracts without a majority vote of the [managing] partners, his entering into the [Focal Point] contracts was outside his duties as a partner and therefore not 'taken in reliance on the provisions of' the Partnership Agreement." The district court therefore determined that Kerwin was not shielded by the limitation of liability clause in the Partnership Agreement. We believe the district court's reasoning is incomplete, but we agree with the ultimate determination that Kerwin is not shielded from liability under paragraph 5.4 of the Partnership Agreement.

Paragraph 5.4 quoted above provides for several scenarios which excuse liability, and as we read it, the actions which gave rise to each scenario must have been taken in good faith. The district court made no specific comment on whether Kerwin's conduct was taken in "good faith," but we believe the court's factual findings are inconsistent with good faith; thus, Kerwin is not shielded from liability under any scenario in paragraph 5.4 of the Partnership Agreement.

According to the court's findings, Kerwin acknowledged that a consensus of the managing partners was required to enter into the Focal Point contracts and contended that a consensus had been reached. To the contrary, the district court found that Perry and Knud had no prior knowledge of the Focal Point contracts. The court found that "consternation . . . erupted once it became known that Perry and Kerwin were presenting corn prices to [FNB] which should have matched, but did not." The court stated that, if all four managing partners had watched the "spectacular drops in the value of their corn crop, it would seem that someone would remember a specific, undoubtedly

unpleasant conversation," but that there was no such exchange. The district court noted that the Focal Point contracts led to an "incredible loss in corn contract prices [which] would have been cited as a reason to end the partnership, but it was not." The district court found that "the partnership lost significant money" as a result of the second and third series of contracts. The district court found the total loss was $2,144,350. The district court determined that Kerwin's actions were outside and therefore not "'taken in reliance on the provisions of'" the Partnership Agreement.

The findings by the district court in this case wherein Kerwin shared neither the fact of entering into the Focal Point contracts nor the fact of repeated significant losses with his partners cannot be explained by oversight or forgetfulness. Kerwin's failure to mention the exposure of the partnership on the front side of the Focal Point contracts and the over $2 million loss on the back side, does not meet the measure of candor expected among partners. Despite his assertion of good faith, Kerwin was not forthright with his partners about important matters and the facts are inconsistent with Kerwin's having taken action in good faith. Because good faith is required to shield Kerwin from liability under each scenario in paragraph 5.4 of the Partnership Agreement, given the absence of good faith, Kerwin cannot take advantage of the provisions of paragraph 5.4, as the district court determined.

## CONCLUSION

We determine that the district court was not clearly wrong when it determined that Kerwin was not authorized to enter into the Focal Point contracts on behalf of the partnership and when it determined that Kerwin's actions of entering into the Focal Point contracts on the partnership's behalf were not ratified. We further determine that the limitation of liability clause in the Partnership Agreement did not shield Kerwin from liability for the partnership's losses due to the Focal Point contracts. We therefore affirm the order of the district court awarding judgment and damages to the appellees.

Affirmed.