773 N.W.2d 145 (2009)
278 Neb. 713
Frank KORICIC, as Trustee for the heirs and next of kin of Manda Baker, appellant,
v.
BEVERLY ENTERPRISES  NEBRASKA, INC., formerly doing business as Beverly Hallmark, et al., appellees.
No. S-08-1167.
Supreme Court of Nebraska.
October 16, 2009.
*148 Brian G. Brooks, P.L.L.C., Richard F. Hitz, of Hauptman, O'Brien, Wolf & Lathrop, P.C., Omaha, and S. Drake Martin, of Nix, Patterson & Roach, L.L.P., Daingerfield, for appellant.
Rodney M. Confer and Jeanelle R. Lust, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., Lincoln, for appellees.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.
The appellant, Frank Koricic (Frank), lived with his elderly mother, Manda Baker (Manda), and assisted her in her daily affairs. When her health declined, she was admitted to Beverly Hallmark, a nursing home in Omaha, Nebraska. At Manda's admission, Frank signed several documents for her. One of the documents was an optional arbitration agreement.
This appeal presents the issue whether Frank had authority to act as Manda's agent and to enter into the arbitration agreement for her. The district court determined that because Frank had actual authority to enter into the arbitration agreement, the agreement bound her estate. Although we agree that Frank had authority to sign the mandatory paperwork for admission, we conclude that Frank did not have authority to sign the arbitration agreement because it was not a condition of admission. We reverse the district court's order dismissing Frank's complaint.
Born in what is now Croatia in 1912, Manda immigrated to Omaha in 1958. She had a limited ability to read, speak, or understand English. Frank immigrated to Omaha in 1966 and lived with Manda for most of the following 40 years.
As Manda aged, Frank assisted her in managing her affairs. In 1998, when Manda's health started declining, Frank began signing medical authorizations for her. He testified that he signed only medical documents at the hospital and that Manda signed all other documents. Frank stated that he would explain documents to Manda and that if she wanted them signed, she would have Frank sign for her. Frank testified that he never signed anything without discussing it with Manda and that he never signed anything she did not agree with. Frank described their relationship as a collaborative effort, with him serving as Manda's advisor and interpreter. While he might offer advice, he took only the actions Manda directed him to take. Manda was never declared incompetent, *149 and she never granted Frank power of attorney over her affairs.
In November 2005, Frank took Manda to Beverly Hallmark. It is undisputed that Manda was competent when she was admitted to Beverly Hallmark. Frank accompanied Manda during her admission, and after Frank placed her in her room, an employee of Beverly Hallmark took Frank to the office where he signed the paperwork for her admission. Manda was not present when Frank signed the admission papers, and Frank never discussed the content of the admission paperwork with her. Frank claimed that he did not read any of the paperwork and that the employee did not explain any of the documents.
One of the papers Frank signed was a "Resident and Facility Arbitration Agreement" that Beverly Hallmark presented to all residents upon admission. At the top of the agreement, it states that it is not a condition of admission. The agreement provides that "any and all claims, disputes, and controversies . . . arising out of, or in connection with, or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration. . . ."
Before Manda died in September 2007, she allegedly sustained injuries and pain and suffering because of Beverly Hallmark's negligence. Frank, as Manda's next of kin and trustee of her estate, filed suit against Beverly Enterprises  Nebraska, Inc., formerly doing business as Beverly Hallmark; Beverly Health and Rehabilitation Services, Inc.; and Beverly Enterprises, Inc. (collectively Beverly Hallmark), alleging negligence, breach of contract, and breach of fiduciary duty. Beverly Hallmark moved to dismiss the case and to compel arbitration under the arbitration agreement. Frank argued that Beverly Hallmark could not enforce the arbitration agreement against Manda's estate because Frank, not Manda, had signed the arbitration agreement.
The district court concluded that the arbitration agreement was valid and enforceable against Manda's estate. Because Manda had authorized Frank to sign medical authorizations for her as early as 1998, the court concluded that Frank had actual authority to sign the arbitration agreement. And because all allegations, if true, would fall under the arbitration agreement, the district court dismissed the case without prejudice to arbitration.
Frank asserts that the trial court erred in determining (1) that Frank had authority as Manda's agent to sign the arbitration agreement for her and (2) that the agreement bound her estate.
Generally, whether an agency relationship exists presents a factual question.[1] The scope of an agent's authority also is a question of fact.[2] In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong.[3]
Because arbitration is purely a matter of contract, we first determine whether an agreement to arbitrate exists under basic *150 contract principles.[4] Here, because Manda did not sign the arbitration agreement, we focus on whether Frank acted as Manda's agent with authority to enter into the arbitration agreement. So we begin with a discussion of agency law. Beverly Hallmark bears the burden of proving Frank's authority and that his acts were within the scope of his authority.[5] Beverly Hallmark claims that Frank, as an agent, had actual authority to bind Manda to the arbitration agreement or, in the alternative, that he had apparent authority.
An "agent" is a person authorized by the principal to act on the principal's behalf and under the principal's control.[6] For an agency relationship to arise, the principal "manifests assent" to the agent that the agent will "act on the principal's behalf and subject to the principal's control."[7] And the agent "manifests assent or otherwise consents so to act."[8] An agency relationship may be implied from the words and conduct of the parties and the circumstances of the case evidencing an intention to create the relationship irrespective of the words or terminology used by the parties to characterize or describe their relationship.[9]
Actual authority is authority that the principal expressly grants to the agent or authority to which the principal consents.[10] A subcategory of actual authority is implied authority, which courts typically use to denote actual authority either to (1) do what is necessary to accomplish the agent's express responsibilities or (2) act in a manner that the agent reasonably believes the principal wishes the agent to act, in light of the principal's objectives and manifestations.[11] When a principal delegates authority to an agent to accomplish a task without specific directions, the grant of authority includes the agent's ability to exercise his or her discretion and make reasonable determinations concerning the details of how the agent will exercise that authority.[12]
Frank signed medical documents for Manda under her instructions for 10 years. Frank and Manda discussed her health care treatment options, and she repeatedly consented to his signing for her. Frank testified that Manda expressly gave him permission to sign medical documents for her but that he never signed for her without her express permission. He testified that "when she was kind of more sick I was signing, you know, all the time in the hospital." Manda never objected to Frank's signing medical documents for her.
The record shows that in November 2005, Frank and Manda went to Beverly Hallmark to admit her to the nursing home. During his deposition, Frank recounted their conversation, stating that Manda understood she was being admitted to the nursing home and that Frank would *151 take care of the necessary admission documents:
[Beverly Hallmark's counsel:] Before you got to the nursing home, had you talked with [Manda] about the fact that you were going to take her there?
[Frank:] Yeah . . . .
. . . .
Q. And she understood that you were going to meet with the office people?
A. What everybody, whatever was going to be done, she trusts me. And I went over there and done the best I can.
Q. You talked to her about that before you got there that day?
A. Right.
Q. She understood that, you know, whatever needed to be done in the office, you were going to do it for her?
A. Right.
Q. You talked about that with her?
A. Together, again together, we agree together, we do it together.
Based on Frank's testimony, Manda authorized Frank to sign the paperwork required for her admission to Beverly Hallmark.
But the arbitration agreement is another matterBeverly Hallmark did not require it as a condition of Manda's admission. The agreement was optional and was not required for Manda to remain at the facility. We agree with the district court's finding that an agency relationship existed between Manda and Frank. We also agree that as Manda's agent, Manda authorized Frank to sign the required admission papers. But we conclude that his actual authority did not extend to signing an arbitration agreement that would waive Manda's right of access to the courts and to trial by jury. The district court's finding that Frank had actual authority to sign the arbitration agreement was clearly erroneous.
Having concluded that Frank's actual authority did not extend to signing the arbitration agreement, we now turn to Beverly Hallmark's contention that Frank had apparent authority to bind Manda to the arbitration agreement. Beverly Hallmark claims that because Manda allowed Frank to leave her room with an employee of Beverly Hallmark to sign the required admission papers, it reasonably believed that Frank had authority to sign the arbitration agreement.
Apparent authority is authority that is conferred when the principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon an agent's apparent authority.[13] Apparent authority gives an agent the power to affect the principal's legal relationships with third parties. The power arises from and is limited to the principal's manifestations to those third parties about the relationships.[14] Stated another way, apparent authority for which a principle may be liable exists only when the third party's belief is traceable to the principal's manifestation and cannot be established by the agent's acts, declarations, or conduct.[15] Manifestations include explicit statements the principal makes to a third party or statements made by others concerning an actor's authority that reach the third party and the third party can trace to the principal.[16] *152 For apparent authority to exist, the principal must act in a way that induces a reasonable third person to believe that another person has authority to act for him or her.[17] Whether an agent has apparent authority to bind the principal is a factual question determined from all the circumstances of the transaction.[18] Whether Beverly Hallmark can trace Frank's alleged authority to sign the arbitration agreement to Manda's actions and whether Beverly Hallmark reasonably relied upon Frank's actions in signing the arbitration agreement present factual questions.
Here, Manda and Frank discussed her admission before she reached the facility. Frank left with an employee of Beverly Hallmark to sign the admission papers while Manda remained in her room. No evidence suggests that (1) Manda knew Frank would be asked to sign an arbitration agreement, (2) Manda represented to a Beverly Hallmark employee that she authorized Frank to sign the arbitration agreement, or (3) she later ratified the agreement. And we do not believe that the Beverly Hallmark employee could reasonably believe that Frank had authority to sign the arbitration agreement under these circumstances. Beverly Hallmark knew of Manda's limited ability to understand these documents, or she would not have been asking her son Frank to sign them for her. Nothing in the record suggests that a reasonable person should have expected an arbitration agreement to be included with admission documents for a nursing home. So Beverly Hallmark was not justified in relying solely on Manda's authorization of Frank to sign admission papers as apparent authority to bind her to an arbitration agreement. We conclude that these circumstances preclude Beverly Hallmark from relying on the doctrine of apparent authority.
We reverse the trial court's order to dismiss Frank's complaint and remand the cause for further proceedings.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] See, Broad v. Randy Bauer Ins. Agency, 275 Neb. 788, 749 N.W.2d 478 (2008); Metropolitan Life Ins. Co. v. SID No. 222, 204 Neb. 350, 281 N.W.2d 922 (1979).
[2] State ex rel. Medlin v. Little, 270 Neb. 414, 703 N.W.2d 593 (2005).
[3] Albert v. Heritage Admin. Servs., 277 Neb. 404, 763 N.W.2d 373 (2009); Aon Consulting v. Midlands Fin. Benefits, 275 Neb. 642, 748 N.W.2d 626 (2008).
[4] Kelley v. Benchmark Homes, Inc., 250 Neb. 367, 550 N.W.2d 640 (1996), disapproved on other grounds, Webb v. American Employers Group, 268 Neb. 473, 684 N.W.2d 33 (2004).
[5] See Western Fertilizer v. BRG, 228 Neb. 776, 424 N.W.2d 588 (1988).
[6] McCurry v. School Dist. of Valley, 242 Neb. 504, 496 N.W.2d 433 (1993).
[7] Restatement (Third) of Agency § 1.01 at 17 (2006).
[8] Id.
[9] See McCurry, supra note 6. See, also, State ex rel. Medlin, supra note 2.
[10] Restatement, supra note 7, § 2.01, comment c.
[11] Id., comment b.
[12] Id., § 2.02.
[13] See Franksen v. Crossroads Joint Venture, 245 Neb. 863, 515 N.W.2d 794 (1994).
[14] See State ex rel. Medlin, supra note 2, citing Franksen, supra note 13.
[15] Restatement, supra note 7, § 2.03. See, also, State ex rel. Medlin, supra note 2; Restatement, supra note 7, § 3.03, comment b.
[16] Restatement, supra note 7, § 2.03, comment c. See, also, Restatement, supra note 7, § 1.03.
[17] See id. See, also, Nebraska Tractor & Equipment Co. v. Great Lakes Pipe Line Co., 156 Neb. 366, 56 N.W.2d 288 (1953); First Nat. Bank of Omaha v. Acceptance Ins. Cos., 12 Neb.App. 353, 675 N.W.2d 689 (2004).
[18] See Western Fertilizer, supra note 5.