Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/29/2016 09:07 AM CDT

- 326 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

RM Campbell Industrial, Inc., appellee,
v. Midwest Renewable Energy,
LLC, appellant.
___ N.W.2d ___

Filed July 29, 2016.    No. S-15-529.

1. **Res Judicata: Collateral Estoppel.** The applicability of claim and issue preclusion is a question of law.
2. **Statutes.** Statutory interpretation presents a question of law.
3. **Principal and Agent.** The scope of an agent's authority is a question of fact.
4. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, which an appellate court independently decides.
5. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.
6. **Contracts.** The determination of whether goods or nongoods predominate a contract is generally a question of law.
7. **Judgments: Res Judicata.** The doctrine of res judicata, or claim preclusion, bars the relitigation of a matter that has been directly addressed or necessarily included in a former adjudication if (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits, and (4) the same parties or their privies were involved in both actions.
8. **Res Judicata.** The doctrine of res judicata, or claim preclusion, bars relitigation not only of those matters actually litigated, but also of those matters which might have been litigated in the prior action.

- 327 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

9. ____. The doctrine of res judicata, or claim preclusion, rests on the necessity to terminate litigation and on the belief that a person should not be vexed twice for the same cause.

10. **Judgments: Collateral Estoppel.** Under the doctrine of collateral estoppel, or issue preclusion, when an issue of ultimate fact has been determined by a final judgment, that issue cannot again be litigated between the same parties in a future lawsuit.

11. **Collateral Estoppel.** There are four conditions that must exist for issue preclusion to apply: (1) The identical issue was decided in a prior action, (2) there was a judgment on the merits which was final, (3) the party against whom the rule is applied was a party or in privity with a party to the prior action, and (4) there was an opportunity to fully and fairly litigate the issue in the prior action.

12. **Res Judicata: Collateral Estoppel.** In contrast to claim preclusion, the doctrine of issue preclusion does not apply to matters which might or could have been litigated but were not.

13. **Principal and Agent: Words and Phrases.** An "agent" is a person authorized by the principal to act on the principal's behalf and under the principal's control.

14. **Agency.** For an agency relationship to arise, the principal manifests assent to the agent that the agent will act on the principal's behalf and subject to the principal's control and the agent manifests assent or otherwise consents so to act.

15. **Agency: Intent.** An agency relationship may be implied from the words and conduct of the parties and the circumstances of the case evidencing an intention to create the relationship irrespective of the words or terminology used by the parties to characterize or describe their relationship.

16. **Principal and Agent.** Actual authority is authority that the principal expressly grants to the agent or authority to which the principal consents.

17. ____. A subcategory of actual authority is implied authority, which courts typically use to denote actual authority either to (1) do what is necessary to accomplish the agent's express responsibilities or (2) act in a manner that the agent reasonably believes the principal wishes the agent to act, in light of the principal's objectives and manifestations.

18. ____. When a principal delegates authority to an agent to accomplish a task without specific directions, the grant of authority includes the agent's ability to exercise his or her discretion and make reasonable determinations concerning the details of how the agent will exercise that authority.

- 328 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

19. ____. Apparent authority is authority that is conferred when the principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon an agent's apparent authority.

20. ____. Apparent authority gives an agent the power to affect the principal's legal relationships with third parties. The power arises from and is limited to the principal's manifestations to those third parties about the relationships.

21. **Principal and Agent: Proof.** Apparent authority for which a principal may be liable exists only when the third party's belief is traceable to the principal's manifestation and cannot be established by the agent's acts, declarations, or conduct. Manifestations include explicit statements the principal makes to a third party or statements made by others concerning an actor's authority that reach the third party and the third party can trace to the principal.

22. **Principal and Agent.** For apparent authority to exist, the principal must act in a way that induces a reasonable third person to believe that another person has authority to act for him or her.

23. ____. Whether an agent has apparent authority to bind the principal is a factual question determined from all the circumstances of the transaction.

24. **Jury Instructions: Pleadings: Evidence.** A litigant is entitled to have the jury instructed upon only those theories of the case which are presented by the pleadings and which are supported by competent evidence.

25. **Contracts: Actions: Substantial Performance.** To successfully bring an action on a contract, a plaintiff must first establish that the plaintiff substantially performed the plaintiff's obligations under the contract. To establish substantial performance under a contract, any deviations from the contract must be relatively minor and unimportant.

26. **Contracts: Substantial Performance.** If there is substantial performance, a contract action may be maintained, but without prejudice to any showing of damage on the part of the defendant for failure to receive full and complete performance.

27. **Contracts: Substantial Performance**: **Damages.** Where there is a lack of substantial performance, but there has been a part performance and it has been of substantial benefit to the other party and he or she has accepted and retained the benefits thereof, he or she should not be permitted entirely to avoid the duties assumed by him or her under his or her contract, and, under such circumstances, the party partially performing is entitled to recover the reasonable or fair value of such performance, subject to the reciprocal right of the other party to recoup such damages as he or she has suffered from the failure of the part-performing party to perform fully or substantially his or her contract.

- 329 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

28. **Uniform Commercial Code.** Nebraska's Uniform Commercial Code applies to transactions in goods. If a transaction is not for the sale of goods, the provisions of the Uniform Commercial Code do not apply to that transaction.

29. **Uniform Commercial Code: Sales: Warranty.** The test for inclusion in or exclusion from the sales provisions of the Uniform Commercial Code is not whether the contracts are mixed but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved, or whether they are transactions of sale, with labor incidentally involved.

30. ____: ____: ____. The Uniform Commercial Code applies when the principal purpose of the transaction is the sale of goods, even though in order for the goods to be utilized, some installation is required. On the other hand, if the contract is principally for services and the goods are merely incidental to the contract, the provisions of the Uniform Commercial Code do not apply.

31. **Contracts: Quantum Meruit.** Quantum meruit is premised on the existence of a contract implied by law; however, the law only implies a contract and allows a recovery under the theory when the parties have not entered into an express agreement.

Appeal from the District Court for Douglas County: TIMOTHY P. BURNS, Judge. Affirmed.

Jerrold L. Strasheim for appellant.

Karl Von Oldenburg, of Brumbaugh & Quandahl, P.C., L.L.O., for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, MILLER-LERMAN, CASSEL, STACY, and KELCH, JJ.

HEAVICAN, C.J.
## INTRODUCTION
RM Campbell Industrial, Inc. (Campbell), filed suit against Midwest Renewable Energy, LLC (Midwest), for breach of contract and sought damages in the amount of $158,010.98. Following trial, the jury found for Campbell in the amount of $154,510.98. Midwest appeals. We affirm.

## FACTUAL BACKGROUND

Midwest owns an ethanol plant in Sutherland, Nebraska. At the relevant time, Randall Kramer worked for both Midwest and another entity, KL Process Design Group, LLC (KL Process). In August 2006, at a time when Kramer worked for both entities simultaneously, Kramer entered into a purchase order contract with Campbell for work on the first phase in the construction of the Sutherland plant. It is not disputed that the work pursuant to this contract was paid for and completed.

In November 2006, Kramer again approached Campbell about doing work as a subcontractor on the expansion of the Sutherland plant. Second and third phases were anticipated, but Campbell and Kramer entered into a contract for goods and services for only the second phase of the project. The contract, entered into on November 9, totaled $2,411,431.02. By this time, Kramer was employed only by KL Process and the terms of the contract itself indicated that the contract was between Campbell and KL Process.

Initially, Campbell sent invoices for payment to KL Process' offices in South Dakota. But by May 2007, the owner and president of Campbell testified he was told to send the invoices directly to Midwest at the address of the Sutherland plant. Invoices were approved by KL Process and then paid by Midwest's controller on Midwest's account; the evidence shows that this was done primarily to take advantage of tax incentives offered by the State of Nebraska, colloquially referred to as "L.B. 775" incentives.[1]

In August 2007, KL Process updated Campbell on its financial situation and Midwest's current inability to pay outstanding balances until new financing had been obtained. No complaint was made about Campbell's performance. In February 2008, Midwest wrote to Campbell regarding Midwest's lack of

---

[1] See, 1987 Neb. Laws, L.B. 775; Employment and Investment Growth Act, Neb. Rev. Stat. §§ 77-4101 to 77-4112 (Reissue 2009 & Cum. Supp. 2014).

- 331 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

payment and acknowledged an amount owed of $919,020.45. Midwest also sent a check for $32,089.96, with the promise of an additional $30,000 to be paid monthly thereafter.

But no payment was made in March. Midwest acknowledged the debt in writing once more, made no complaint about Campbell's services, and promised to make payment as soon as there was money to do so. That same month, KL Process informed Campbell that it had ceased work on the second phase of the project, but that it believed the work stoppage was temporary; however, work never resumed on the second phase.

Campbell filed suit against KL Process (now KL Energy Corporation) and Midwest. KL Energy Corporation is in bankruptcy and is not a party to this appeal. Suit proceeded against Midwest for breach of contract based upon the 2-page purchase order between KL Process and Campbell.

Several threshold issues were decided prior to trial and are relevant on appeal. Midwest contended that a prior lien action involving the Sutherland plant filed in Lincoln County District Court barred Campbell's action under the principles of collateral estoppel and res judicata. Midwest also contended that Campbell, a foreign corporation, lacked the appropriate certificate to transact business or file suit in Nebraska. These arguments were both rejected by the district court.

At trial, Midwest argued that there was no contract between it and Campbell because KL Process lacked the actual or apparent authority to bind Midwest to any agreement. Midwest also argued that Campbell failed to substantially complete its obligations under the contract. The jury found for Campbell in the amount of $154,510.98.

ASSIGNMENTS OF ERROR

Midwest assigns, consolidated and restated, that the district court erred in (1) finding that Campbell's breach of contract action was not barred by res judicata or collateral estoppel; (2) finding that Campbell could maintain suit despite its failure to

hold a Nebraska certificate of authority; (3) concluding there was sufficient evidence for a jury question on (a) whether KL Process acted as an agent of Midwest in entering into the subcontract with Campbell and (b) whether KL Process had actual or apparent authority to bind Midwest to the subcontract, such that there was an enforceable contract between Midwest and Campbell, and in instructing the jury as it did; (4) not finding that Campbell had to prove substantial compliance with the subcontract and not instructing the jury on this; (5) finding there was a jury question regarding proximate causation; (6) applying article 2 of Nebraska's Uniform Commercial Code (U.C.C.) and not the common law to the agreement; and (7) finding there was a jury question on damages and incorrectly instructing the jury regarding damages.

## STANDARD OF REVIEW

[1] The applicability of claim and issue preclusion is a question of law.[2]

[2] Statutory interpretation presents a question of law.[3]

[3] The scope of an agent's authority is a question of fact.[4]

[4] Whether a jury instruction is correct is a question of law, which an appellate court independently decides.[5]

[5] To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[6]

---

[2] *McGill v. Lion Place Condo. Assn.*, 291 Neb. 70, 864 N.W.2d 642 (2015).

[3] *Pettit v. Nebraska Dept. of Corr. Servs.*, 291 Neb. 513, 867 N.W.2d 553 (2015).

[4] *Koricic v. Beverly Enters. - Neb.*, 278 Neb. 713, 773 N.W.2d 145 (2009).

[5] *Golnick v. Callender*, 290 Neb. 395, 860 N.W.2d 180 (2015).

[6] *Id.*

- 333 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

[6] The determination of whether goods or nongoods predominate a contract is generally a question of law.[7]

## ANALYSIS

*Effect of Lincoln County*
*Construction Lien.*

In its first assignment of error, Midwest assigns that the district court erred in not finding that the dismissal of Campbell's construction lien at the time of the judicial foreclosure of another lienholder's lien operated to preclude Campbell's suit.

Campbell filed a construction lien on the Sutherland plant in Lincoln County, Nebraska, on April 11, 2008. Another supplier, Avid Solutions, Inc. (Avid), subsequently commenced a foreclosure on its own construction lien on September 29. Avid named Campbell as a fellow lienholder and served it with the complaint against Midwest. Campbell did not appear.

Proceedings continued against Midwest in Avid's foreclosure. In a journal entry dated June 7, 2011, the district court ruled on several preliminary matters, including noting that a "default judgment will be entered against any Defendant who does not appear at the contested trial." The district court's decree, entered on July 14, noted that Campbell, as well as others, did not appear at trial and that their liens were "dismissed and released."

[7-9] The doctrine of res judicata, or claim preclusion, bars the relitigation of a matter that has been directly addressed or necessarily included in a former adjudication if (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits, and (4) the same parties or their privies were involved in both actions.[8] The doctrine bars

---

[7] See *MBH, Inc. v. John Otte Oil & Propane*, 15 Neb. App. 341, 727 N.W.2d 238 (2007) (citing to other jurisdictions as issue of first impression in Nebraska).

[8] *Eicher v. Mid America Fin. Invest. Corp.*, 270 Neb. 370, 702 N.W.2d 792 (2005).

- 334 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

relitigation not only of those matters actually litigated, but also of those matters which might have been litigated in the prior action.[9] The doctrine rests on the necessity to terminate litigation and on the belief that a person should not be vexed twice for the same cause.[10]

[10,11] Under the doctrine of collateral estoppel, or issue preclusion, when an issue of ultimate fact has been determined by a final judgment, that issue cannot again be litigated between the same parties in a future lawsuit.[11] There are four conditions that must exist for issue preclusion to apply: (1) The identical issue was decided in a prior action, (2) there was a judgment on the merits which was final, (3) the party against whom the rule is applied was a party or in privity with a party to the prior action, and (4) there was an opportunity to fully and fairly litigate the issue in the prior action.[12]

[12] As an initial matter, we conclude that issue preclusion is not applicable here to bar Campbell's suit. In contrast to claim preclusion, the doctrine of issue preclusion does not apply to matters which might or could have been litigated but were not.[13] Campbell never appeared in Avid's lien foreclosure proceedings, and the issue of whether Campbell and Midwest had an agreement was not fully and fairly litigated for purposes of issue preclusion.

Turning next to claim preclusion, we conclude that the issue of an agreement between Campbell and Midwest was not decided on its merits. Claim preclusion bars relitigation, not only of those matters actually litigated, but also of those matters which might have been litigated in the prior action. But we conclude that there was no decision on the merits in the underlying lien foreclosure, because Campbell did not

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] 47 Am. Jur. 2d *Judgments* § 493 (2006).

- 335 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

participate in the Avid foreclosure and was a party only by virtue of Neb. Rev. Stat. § 52-155(2) (Reissue 2010), which provides that "all claimants having recorded liens may join as plaintiffs and those who do not join as plaintiffs may be joined as defendants."

The district court and Campbell rely on *Tilt-Up Concrete v. Star City/Federal*,[14] which holds that a construction lien did not eliminate a contractor's common-law right to sue for breach of contract. While we do not find *Tilt-Up Concrete* to be absolutely dispositive as to issue preclusion, we noted in that case that a plaintiff on similar facts was not precluded from bringing a contract action simply because the plaintiff also foreclosed on a construction lien. The choice inherent from *Tilt-Up Concrete* would be obviated if we were to conclude that, here, Avid's foreclosing on its own lien precluded other lienholders from bringing a separate action to recover contract damages.

Midwest's first assignment of error is without merit.

*Certificate of Authority.*

In its second assignment of error, Midwest assigns that the district court erred in not dismissing Campbell's suit, because Campbell is a foreign corporation that does not hold a Nebraska certificate of authority. It is not disputed that Campbell is a foreign corporation and has not, at any relevant time, held a certificate of authority in Nebraska.

Neb. Rev. Stat. § 21-20,168(1) (Reissue 2012) provides that "[a] foreign corporation may not transact business in this state until it obtains a certificate of authority from the Secretary of State." As relevant to this analysis, subsection (2) of § 21-20,168 explains that, among other exceptions, transacting business in interstate commerce shall not constitute transacting business within the meaning of subsection (1) of

---

[14] *Tilt-Up Concrete v. Star City/Federal*, 261 Neb. 64, 621 N.W.2d 502 (2001).

§ 21-20,168.[15] Neb. Rev. Stat. § 21-20,169(1) (Reissue 2012) provides that "[a] foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority."

A court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless.[16] Statutes relating to the same subject, although enacted at different times, are in pari materia and should be construed together.[17]

Reading §§ 21-20,168 and 21-20,169 together, we conclude that because Campbell was transacting business in interstate commerce, it was not transacting business for purposes of § 21-20,169(1).

This result is consistent with *Allenberg Cotton Co. v. Pittman*.[18] There, the plaintiff, a foreign corporation, sued to enforce a contract with a Mississippi defendant. The Mississippi Supreme Court held that the contract was in intrastate commerce and could not be maintained by a foreign corporation. The U.S. Supreme Court disagreed and held that the contract was in interstate commerce and that the Mississippi statute precluding suit by a foreign corporation which did not hold a certificate of authority was in contravention of the Commerce Clause.

We conclude that Campbell did not need to obtain a certificate of authority in order to maintain this suit against Midwest. There is no merit to Midwest's second assignment of error.

*Existence of Contract.*

In its third assignment of error, Midwest contends that there was no enforceable contract between it and Campbell,

---

[15] See, also, *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20, 95 S. Ct. 260, 42 L. Ed. 2d 195 (1974).

[16] *Stick v. City of Omaha*, 289 Neb. 752, 857 N.W.2d 561 (2015).

[17] *Caniglia v. Caniglia*, 285 Neb. 930, 830 N.W.2d 207 (2013).

[18] *Allenberg Cotton Co. v. Pittman, supra* note 15.

- 337 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

because it did not directly enter into a contract with Campbell and because KL Process was not Midwest's agent and was not acting with actual or apparent authority. Midwest also assigns that instruction No. 5 was an incorrect statement of the law and that the district court erred in not giving its proposed instructions Nos. 6 through 8.

[13-15] An "agent" is a person authorized by the principal to act on the principal's behalf and under the principal's control.[19] For an agency relationship to arise, the principal "manifests assent" to the agent that the agent will "'act on the principal's behalf and subject to the principal's control.'"[20] And the agent "'manifests assent or otherwise consents so to act.'"[21] An agency relationship may be implied from the words and conduct of the parties and the circumstances of the case evidencing an intention to create the relationship irrespective of the words or terminology used by the parties to characterize or describe their relationship.[22]

[16-18] Actual authority is authority that the principal expressly grants to the agent or authority to which the principal consents.[23] A subcategory of actual authority is implied authority, which courts typically use to denote actual authority either to (1) do what is necessary to accomplish the agent's express responsibilities or (2) act in a manner that the agent reasonably believes the principal wishes the agent to act, in light of the principal's objectives and manifestations.[24] When a principal delegates authority to an agent to accomplish a task without specific directions, the grant of authority includes the agent's ability to exercise his or her discretion and make

---

[19] *Koricic v. Beverly Enters. - Neb., supra* note 4.

[20] *Id.* at 717, 773 N.W.2d at 150.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Koricic v. Beverly Enters. - Neb., supra* note 4.

reasonable determinations concerning the details of how the agent will exercise that authority.[25]

[19-21] Apparent authority is authority that is conferred when the principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon an agent's apparent authority.[26] Apparent authority gives an agent the power to affect the principal's legal relationships with third parties.[27] The power arises from and is limited to the principal's manifestations to those third parties about the relationships.[28] Stated another way, apparent authority for which a principal may be liable exists only when the third party's belief is traceable to the principal's manifestation and cannot be established by the agent's acts, declarations, or conduct.[29] Manifestations include explicit statements the principal makes to a third party or statements made by others concerning an actor's authority that reach the third party and the third party can trace to the principal.[30]

[22,23] For apparent authority to exist, the principal must act in a way that induces a reasonable third person to believe that another person has authority to act for him or her.[31] Whether an agent has apparent authority to bind the principal is a factual question determined from all the circumstances of the transaction.[32]

Midwest is, of course, correct in that it did not directly contract with Campbell. Midwest further argues that this

---

[25] *Id.*

[26] *StoreVisions. v. Omaha Tribe of Neb.*, 281 Neb. 238, 795 N.W.2d 271 (2011).

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

- 339 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

court need look no further than the terms of the contract between it and KL Process to see that KL Process was not acting as its agent. That contract specifically notes:

> Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between [Midwest] and Design Consultant, any Subcontractor or Sub-Subcontractor, except that KL Process shall provide in its contracts with such Subcontractor and Sub-Subcontractors that [Midwest] is an intended third party beneficiary of those contracts with the right to enforce them.

But there is no evidence that Campbell or its owner and president was aware of the terms of the contract between Midwest and KL Process. Moreover, the contract between Campbell and KL Process was executed in November 2006. At that time, the contract between Midwest and KL Process had not yet been executed; the latter contract was not entered into until July 18, 2007.

A review of other provisions of that contract show that while Midwest may not have wanted to be liable on contracts entered into by KL Process, it nevertheless maintained a significant amount of control over KL Process. For example, KL Process had to provide notice to Midwest of any design consultant or subcontractor it wished to use and could not enter into binding contracts with those parties without notice to Midwest. And Midwest had veto power over any design consultant or subcontractor.

In any case, how KL Process and Midwest characterized their relationship does not affect our resolution of this issue. As this court has noted, an agency relationship may be implied from the words and conduct of the parties and the circumstances of the case evidencing an intention to create the relationship, irrespective of the words or terminology used by the parties to characterize or describe their relationship.

The jury was instructed in instruction No. 4 as follows:

An agency relationship existed in this case between [Midwest] and KL Process if you find [Midwest] consented to these two things:

1. That KL Process would act on behalf of [Midwest], and

2. That [Midwest] would have the right to control KL Process' acts. It does not matter whether [Midwest] actually exercised control over KL Process, so long as [Midwest] had the right to do so.

Instruction No. 5 provided:

An agency may also exist, by apparent authority, if you find:

1. That [Midwest] led [Campbell] to believe that KL Process was authorized to act on behalf of [Midwest], and

2. That [Campbell's] belief that KL Process had authority to act for [Midwest] was reasonable.

If you so find, then as between [Midwest] and [Campbell], [Midwest] is bound by the acts of KL Process.

The evidence at trial was that the contract between Midwest and KL Process indicated that Midwest was not legally bound by any contract with a subcontractor. But the evidence also showed that Midwest hired KL Process to build its ethanol plant and that Campbell knew the work it had been hired to do was to be done for Midwest. The evidence also showed that at the time of the first phase of the project, Kramer worked for both Midwest and KL Process when he hired Campbell. The evidence showed that Midwest paid Campbell and acknowledged the debt owed to Campbell on multiple occasions via e-mail and letter. Finally, the evidence showed that because of the tax incentives,[33] it was to Midwest's advantage to pay Campbell directly. Given all this, we conclude there was sufficient evidence that an agency relationship existed in this case, by either actual or apparent authority.

---

[33] See, L.B. 775; §§ 77-4101 to 77-4112.

- 341 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

[24] We turn next to Midwest's arguments regarding the jury instructions on the question of apparent authority. To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[34] A litigant is entitled to have the jury instructed upon only those theories of the case which are presented by the pleadings and which are supported by competent evidence.[35]

Midwest objected to instruction No. 5 and had requested instead that its proposed instructions Nos. 6 through 8 be given to the jury.

As to instruction No. 5, Midwest contends that the jury should have been instructed that the party relying on apparent authority cannot be negligent and must use ordinary prudence and that instruction No. 5 was in error because it did not so state. Midwest contended that its proposed instruction No. 6 was a virtual copy of NJI2d Civ. 6.08, entitled "Agency— Apparent Authority," and that instruction No. 7, regarding reliance on apparent authority, and instruction No. 8, defining negligence, should have also been given to the jury.

We disagree with Midwest's characterization of its proposed instruction No. 6. In reality, the instruction given, instruction No. 5, and not proposed instruction No. 6, was almost identical to NJI2d Civ. 6.08. Contrary to Midwest's assertion, NJI2d Civ. 6.08 does not require that the jury find that the party relying on the apparent authority not be negligent and use ordinary prudence. Rather, a jury must only find that the party must be acting reasonably.

The district court did not err in instructing the jury in conformity with instruction No. 5 instead of Midwest's proposed

---

[34] *Golnick v. Callender, supra* note 5.

[35] *Worth v. Kolbeck*, 273 Neb. 163, 728 N.W.2d 282 (2007).

- 342 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

instructions Nos. 6 and 7, dealing with apparent authority. And because the jury did not need to be instructed as to negligence, it was not error for the court to refuse proposed instruction No. 8. There is no merit to Midwest's third assignment of error.

*Substantial Compliance.*

In its fourth assignment of error, Midwest contends that the district court erred in not finding that Campbell had to prove that it had substantially complied with the contract and so instructing the jury.

[25,26] To successfully bring an action on a contract, a plaintiff must first establish that the plaintiff substantially performed the plaintiff's obligations under the contract.[36] To establish substantial performance under a contract, any deviations from the contract must be relatively minor and unimportant.[37] If there is substantial performance, a contract action may be maintained, but without prejudice to any showing of damage on the part of the defendant for failure to receive full and complete performance.[38]

[27] Where there is a lack of substantial performance, but there has been a part performance and it has been of substantial benefit to the other party and he or she has accepted and retained the benefits thereof, he or she should not be permitted entirely to avoid the duties assumed by him or her under his or her contract, and, under such circumstances, the party partially performing is entitled to recover the reasonable or fair value of such performance, subject to the reciprocal right of the other party to recoup such damages as he or she has suffered from the failure of the part-performing party to perform fully or substantially his or her contract.[39]

---

[36] *VRT, Inc. v. Dutton-Lainson Co.*, 247 Neb. 845, 530 N.W.2d 619 (1995).

[37] *Id.*

[38] *Id.*

[39] See *Young v. Tate*, 232 Neb. 915, 442 N.W.2d 865 (1989).

Midwest argues that instructions Nos. 3 and 8, providing for damages generally and giving the specific measure of damages, were incorrect, because they did not instruct regarding substantial performance. But on these facts, we find no error.

There is no dispute that the full terms of the goods and services contract were not met; Campbell ceased providing goods and services when Midwest stopped paying for the work already done. But the record shows that on these facts, this was part performance that was a substantial benefit to Midwest, which accepted and retained the benefit through both the goods received and the tax incentives.

First, we note that the record shows that Midwest attempted to resell the products which Campbell provided under the contract. And Midwest acknowledged on various occasions that it owed the amount now at issue in this litigation. As such, Midwest should not be permitted to avoid the duty to pay.

There is no merit to Midwest's fourth assignment of error.

*Proximate Causation.*

In its fifth assignment of error, Midwest contends Campbell did not prove that Midwest's ceasing payments was the proximate cause of its claimed damages. Particularly, Midwest contends that Campbell's contract was with KL Process and that the reason Campbell was not paid was because KL Process declared bankruptcy.

Having concluded that the jury could find that KL Process was acting as Midwest's agent, there was also sufficient evidence for a jury to find that Campbell's contract losses were due to Midwest's failure to pay. The record is replete with evidence that Midwest, and not KL Process, paid Campbell's invoices and that Midwest acknowledged that a cash shortage meant it had not paid Campbell what was due and further indicated Midwest would pay Campbell as soon as it had funds to do so.

This assignment of error is without merit.

- 344 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

*Applicability of U.C.C.*

In its sixth and seventh assignments of error, Midwest contends that the district court erred in treating this as a contract under the U.C.C. rather than as one under common law and, accordingly, erred in its damages instruction to the jury. Specifically, Midwest objected to instructions Nos. 6 and 8. As to instruction No. 6, Midwest argues that it utilized sale-of-goods language from the U.C.C. when the contract was not controlled by the U.C.C. but by common law. And Midwest contends that, accordingly, the instruction on damages—instruction No. 8—should have been on quantum meruit, not the contract price instruction given to the jury.

[28-30] The U.C.C. applies to transactions in goods.[40] If a transaction is not for the sale of goods, the provision of the U.C.C. do not apply to that transaction.[41]

> The test for inclusion in or exclusion from the sales provisions is not whether the contracts are mixed but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved, or whether they are transactions of sale, with labor incidentally involved.[42]

The U.C.C. applies when the principal purpose of the transaction is the sale of goods, even though in order for the goods to be utilized, some installation is required.[43] On the other hand, if the contract is principally for services and the goods are merely incidental to the contract, the provisions of the U.C.C. do not apply.[44]

---

[40] Neb. U.C.C. § 2-102 (Reissue 2001).

[41] *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.*, 219 Neb. 303, 363 N.W.2d 155 (1985).

[42] *Id.* at 308, 363 N.W.2d at 160.

[43] *Design Data Corp. v. Maryland Cas. Co.*, 243 Neb. 945, 503 N.W.2d 552 (1993).

[44] *Id.*

- 345 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
RM CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY
Cite as 294 Neb. 326

The total original contract was for $2,411,431.02. From examining that contract, over one-half of the total contract appears to be for goods, with the remainder for services. As such, we conclude that this contract was predominantly for the sale of goods and that the U.C.C. controls. There was no error in the damages instruction as given.

[31] And even if the contract were governed by the common law, we disagree that the proper measure of damages would have been under quantum meruit. Quantum meruit is premised on the existence of a contract implied by law; however, the law only implies a contract and allows a recovery under the theory when the parties have not entered into an express agreement.[45] But there is no dispute that there was an express contract in this case; the real issue is whether Midwest is a party to it. We have concluded that it was. Quantum meruit is therefore inapplicable.

Moreover, contrary to Midwest's contention, Campbell introduced proof of its damages in the form of the original contract price, the amount of goods and services provided to Midwest, and the amount actually paid by Midwest. This was an adequate measure of damages.

There is no merit to Midwest's sixth and seventh assignments of error.

## CONCLUSION

The decision of the district court is affirmed.

Affirmed.

---

[45] *Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 369 N.W.2d 96 (1985).