# IN THE SUPREME COURT OF CALIFORNIA

MARK HARROD,

Plaintiff and Respondent,

v.

COUNTRY OAKS PARTNERS, LLC, et al.,

Defendants and Appellants.

S276545

Second Appellate District, Division Four
B312967

Los Angeles County Superior Court
20STCV26536

---

March 28, 2024

Justice Jenkins authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Groban, and Evans concurred.

---

HARROD v. COUNTRY OAKS PARTNERS, LLC

S276545

Opinion of the Court by Jenkins, J.

Under California's Health Care Decisions Law (Prob. Code, § 4600 et seq.),[1] a principal may appoint a health care agent to make health care decisions should the principal later lack capacity to make them. In this case, a health care agent signed two contracts with a skilled nursing facility. One, with state-dictated terms, secured the principal's admission to the facility. The other made arbitration the exclusive pathway for resolving disputes with the facility. This second contract was optional and had no bearing on whether the principal could access the facility or receive care. The issue before us is whether execution of the second, separate, and optional contract for arbitration was a health care decision within the health care agent's authority. It was not, and the facility's owners and operators may not, therefore, rely on the agent's execution of that second agreement to compel arbitration of claims arising from the principal's alleged maltreatment that have been filed in court. We affirm the judgment of the Court of Appeal and remand for further court proceedings.

## I.    BACKGROUND

The Health Care Decisions Law authorizes competent adults to draft powers of attorney for health care, a type of

_____

[1]    Unless specified, further statutory references are to the Probate Code.

advance health care directive, and thereby "authorize [an] agent to make health care decisions." (§ 4671, subd. (a); see §§ 4605, 4629.) The law defines "health care" as "any care, treatment, service, or procedure to maintain, diagnose, or otherwise affect a patient's physical or mental health condition." (§ 4615.) It further defines a "health care decision" as one "regarding the patient's health care, including . . . [¶] (1) Selection and discharge of health care providers and institutions[;] [¶] (2) Approval or disapproval of diagnostic tests, surgical procedures, and programs of medication, including mental health conditions[;] [¶] (3) Directions to provide, withhold, or withdraw artificial nutrition and hydration and all other forms of health care, including cardiopulmonary resuscitation." (§ 4617, subd. (a).) "Subject to any limitations in the power of attorney for health care," an agent "may make health care decisions" and "may also make decisions that may be effective after the principal's death," such as approving organ donation, autopsies, disposition of remains, and records releases. (§ 4683.)

A competent adult desiring a power of attorney for health care may, but need not, use the form found in section 4701. (§ 4700.) Regardless of whether the adult executes this "form or any other writing" to establish a power of attorney, the provisions of the Health Care Decisions Law "govern the effect" of the writing. (*Ibid.*)

Charles Logan executed a power of attorney for health care. He used, not the statutory form, but a California Medical Association form patterned on, and specifically citing to, the Health Care Decisions Law. Logan appointed his nephew, Mark Harrod, as his "health care agent" to make "health care decisions" should Logan's primary physician find Logan unable to make those decisions himself. Paraphrasing the portions of

2

the Health Care Decisions Law defining health care decisions (§ 4617) and decisions after death (§ 4683), the form Logan signed authorized Harrod to (1) "consent, refuse consent, or withdraw consent to any medical care," including care to artificially sustain life; (2) "choose or reject [the principal's] physician, other health care professionals or health care facilities;" (3) "receive and consent to the release of medical information;" and (4) authorize organ donation, an autopsy, and disposal of remains.

About two years after executing this power of attorney, Logan, then approaching his 77th birthday, fell, broke a femur, and became unable to walk. He entered the Country Oaks Care Center (Country Oaks), a skilled nursing facility, to obtain living assistance and rehabilitative treatment. Harrod signed two agreements with the facility on Logan's behalf. The first was an admission agreement that entitled Logan to care at the facility and specified the services to be rendered, payment terms, and facility rules. It was unalterable and its terms were state-mandated. (Health & Saf. Code, § 1559.61 ["all skilled nursing facilities . . . shall use a standard admission agreement developed and adopted by the" state and "[n]o facility shall alter" it unless directed].) The second agreement Harrod signed was an arbitration agreement. Per the requirements of state law applicable to long-term health care facilities and federal regulations governing such facilities participating in Medicare and Medicaid, the arbitration agreement appeared on a separate form and was presented as optional. (See *id.*, § 1599.81, subds. (a), (b) [an arbitration agreement must not be a precondition to facility admission and must "be included on a form separate from the rest of the admission contract"]; 42 C.F.R. § 483.70(n) (2019) [facilities participating in Medicare

and Medicaid "must not require any resident or his or her representative to sign an agreement for binding arbitration as a condition of admission"].)[2] A boxed warning atop this agreement stated, "READ CAREFULLY — Not Part of Admission Agreement," and continued, "Resident shall not be required to sign this arbitration agreement as a condition of admission to this facility or to continue to receive care at the facility."[3] The arbitration agreement stated disputes concerning

---

[2] Neither compliance with, nor the enforceability of, the requirements for arbitration agreements under Health and Safety Code section 1599.81 or 42 C.F.R. § 483.70 (2019) is before us.

[3] The admissions paperwork also included a one-page form stating, "I, Logan Charles, am able to sign for myself but would to like [sic] authorize Harrod Mark my nephew to sign the following documents on my behalf." Below this statement, six categories of documents are listed and next to each is a line with a check mark. The checked categories of documents are: temporary consent to treat, advance directive acknowledgement, influenza vaccine/pneumonia vaccine consent, POLST (Physician Orders for Life-Sustaining Treatment), informed consent for use of device, and California admission packet. Below these selected options is a line on which to print the patient's name, with "Logan Charles" written in. To the right is a line for the patient's signature with a script signature reading "Mark Harrod." Country Oaks mentions this form in its opening brief but does not argue it has any significance to the question we face here. Thus, we need not decide whether this form gave Harrod permission to sign the California admission packet or, if it did, whether it authorized Harrod to agree to arbitration. Nor need we address the possibility that Logan, through this form or by any other act, led defendants to believe Harrod had authority to act under a theory of ostensible agency. (See Civ. Code, § 2300 ["An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him"].)

medical care, the provision of services, and the admission agreement or arbitration agreement would be arbitrated, not litigated in court. Under the agreement, both parties abjured "their constitutional right to have any such dispute decided in a court of law before a jury."

Based on the care he received during his approximately one-month stay at Country Oaks, Logan, with Harrod acting as his guardian ad litem,[4] filed a lawsuit in a California superior court against the facility's owners and operators, Country Oaks Partners, LLC, and Sun-Mar Management Services, Inc. Logan alleged these defendants negligently withheld appropriate care, resulting in Logan suffering a second fall and fracture, being unnecessarily diapered, and developing pressure ulcers. In addition to pleading a cause of action for common law negligence, Logan asserted causes of action for elder abuse and violations of his right as a resident of a skilled nursing facility (Health & Saf. Code, § 1430, subd. (b)). Logan further asked the superior court for a declaration that he was not bound by the arbitration agreement that his health care agent, Harrod, had signed.

Defendants moved to compel arbitration. The superior court denied the motion. It reasoned Harrod's power to make health care decisions for Logan as his health care agent did not

---

[4]      Ad litem means "for the suit" in Latin. (Black's Law Dict. (11th ed. 2019) p. 53.) "When . . . a person who lacks legal capacity to make decisions, or a person for whom a conservator has been appointed is a party, that person shall appear either by a guardian or conservator of the estate or by a guardian ad litem appointed by the court in which the action or proceeding is pending, or by a judge thereof, in each case." (Code Civ. Proc., § 372, subd. (a)(1).)

encompass the power to sign the optional arbitration agreement. The Court of Appeal affirmed, agreeing that a health care decision does not encompass optional, separate arbitration agreements presented alongside mandatory facility admissions paperwork. (*Logan v. Country Oaks Partners, LLC* (2022) 82 Cal.App.5th 365.) Several courts of appeal have reached the opposite conclusion regarding a health care agent's health care decisionmaking authority. (See, e.g., *Garrison v. Superior Court* (2005) 132 Cal.App.4th 253 ["The revocable arbitration agreements were executed as part of the health care decisionmaking process."]; *Hogan v. Country Villa Health Services* (2007) 148 Cal.App.4th 259, 268 [agreeing with *Garrison*].) We now, in the context of Logan's power of attorney for health care, address this conflicting authority.[5]

## II. DISCUSSION

The parties assume Harrod's selection of a skilled nursing facility for Logan, pursuant to the first, mandatory contract for admission, was within the scope of Harrod's agency. They disagree, however, whether Harrod's authority to make "health care decisions" — as granted by Logan's power of attorney for health care — encompassed Harrod's separate and optional decision, pursuant to the second contract, to bind Logan to arbitrate disputes with the facility.

The meaning of a "health care decision" in Logan's power of attorney is firmly linked to the meaning of that term in the

---

[5] Because Logan passed away while this case was pending before us, Harrod, as Logan's successor in interest, is now the named plaintiff and respondent. We only discuss Harrod's authority as Logan's agent pursuant to the power of attorney for health care.

Health Care Decisions Law. That law, which authorizes powers of attorney for health care (§ 4671), provides a definition of the term "health care decisions" (§ 4617) and instructs that its provisions "govern the effect" of writings created under its authority (§ 4700). In turn, Logan's power of attorney, at its very top, indicates that it is created under the authority of the Health Care Decisions Law, invoking the Probate Code sections 4600–4805 that contain the law. Intention is the pole star when interpretating written instruments. (See Civ. Code, § 1636; *Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288; *Boyer v. Murphy* (1927) 202 Cal. 23, 28 [intent is "pole-star" in interpreting deed]; *Todd v. Superior Court of San Francisco* (1919) 181 Cal. 406, 419 [seeking "the general intent or predominant purpose of the instrument"]; *Sullivan v. Davis* (1854) 4 Cal. 291, 292 [describing power of attorney language as an "index of intention"].) Logan's intention to invoke and be governed by the Health Care Decisions Law, in this case, seems plain. Moreover, neither party to this case asserts any deviation between the meaning of "health care decision" in Logan's power of attorney and the Health Care Decisions Law. (Cf. § 4681 ["Except as provided in subdivision (b), the principal may limit the application of any provision of this division" in the power of attorney].) Thus, we interpret Logan's power of attorney by reference not only to its terms, but also to the relevant statutory provisions that govern it. (Cf. *Montrose Chemical Corp. of California v. Superior Court* (2020) 9 Cal.5th 215, 226 [reading insurance agreement "in light of background principles of insurance law"]; *Samson v. Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 231; *Swenson v. File* (1970) 3 Cal.3d 389, 393 [contracting parties "are presumed to know and to have had in mind" the "existing law"].)

Additionally, the Health Care Decisions Law instructs that when it "does not provide a rule governing agents under powers of attorney, the law of agency applies." (§ 4688.) Absent disputed facts, the meaning of a written instrument (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 604), questions of statutory interpretation (*Davis v. Fresno Unified School Dist.* (2023) 14 Cal.5th 671, 687), and the scope of an agent's authority (*Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 658; *Oswald Machine & Equipment, Inc. v. Yip* (1992) 10 Cal.App.4th 1238, 1247) are matters we determine independently as a matter of law. With these governing standards in mind, we probe the meaning of "health care decision" under Logan's power of attorney, the Health Care Decisions Law, and the law of agency.

## A. "Health Care Decision" in the Power of Attorney and Statute

Whether interpreting a provision of a written instrument or statute, we seek the drafters' intent, and we start with the plain meaning of the provision's text and with its context within the statute or instrument. (*People v. Braden* (2023) 14 Cal.5th 791, 804 [statutes]; (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc., supra*, 59 Cal.4th at p. 288 [written instruments].) When a power of attorney is at issue, we have highlighted the importance of plain meaning by stating an agent operating under a power of attorney may not "go beyond it nor beside it." (*Blum v. Robertson* (1864) 24 Cal. 128, 140; see also *Johnston v. Wright* (1856) 6 Cal. 373, 375.)

### 1. Definitional Provisions

As noted above, the Health Care Decisions Law specifies a "health care decision" is one "regarding the patient's health

care" (§ 4617, subd. (a)), with "health care" defined as "any care, treatment, service, or procedure to maintain, diagnose, or otherwise affect a patient's physical or mental health condition" (§ 4615). Logan's power of attorney does not quote these basic definitional provisions. But Logan's power of attorney, as well as the Health Care Decisions Law, both inform our interpretation of the term "health care decision" by listing equivalent examples. Section 4617 states health care decisions include "[s]election and discharge of health care providers and institutions." (§ 4617, subd. (a)(1).) Logan's power of attorney allows the agent to "choose or reject . . . health care professionals or health care facilities." Section 4617 also provides that health care decisions include "[a]pproval or disapproval of diagnostic tests, surgical procedures, and programs of medication, including mental health conditions" (§ 4617, subd. (a)(2)), and also whether "to provide, withhold, or withdraw artificial nutrition and hydration and all other forms of health care, including cardiopulmonary resuscitation" (§ 4617, subd. (a)(3)). Logan's power of attorney likewise authorizes these types of decisions, allowing the agent to consent to or refuse "tests, drugs, surgery," "any medical care or services," or "the provision, withholding, or withdrawal of artificial nutrition and hydration . . . and all other forms of health care, including cardiopulmonary resuscitation." Logan's power of attorney, in accord with other provisions of the Health Care Decisions Law (§§ 4678, 4683), further permits the agent to receive and release medical records so the agent can perform his or her duties and to make decisions regarding disposition of the body after death.

Established canons of statutory construction assist us in ascertaining the meaning of a term primarily defined by way of

a list of examples and the meaning of examples enumerated on such a list. " '[W]hen a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope.' " (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 343.) When we consider the meaning of one item on a list, we tend to adopt a more "restrictive meaning" when to do otherwise would "make the item markedly dissimilar to the other items in the list." (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1012.) When a general term is defined through a list of examples, we tend towards a definition of the general term that is in concert with the items listed. (*Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 159; *International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 342; *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 294; see also Civ. Code, § 3534 ["Particular expressions qualify those which are general."].) These guidelines have particular force when, as here, there is no broadening catchall provision amongst the listed items. (*Bernard v. Foley* (2006) 39 Cal.4th 794, 807.)

These canons of construction weigh against construing the authority to select health care providers and institutions (§ 4617, subd. (a)) to include the power to enter optional, separate dispute resolution agreements, and against interpreting the general term "health care decision" that expansively. Each enumerated example of a health care decision in the Health Care Decisions Law and in Logan's power of attorney directly pertains to who provides health care and what may be done to a principal's body in health, sickness, or

death. There is no catchall provision, no express delegation of power to make decisions that serve other purposes, and no express grant of power to waive access to the courts, agree to arbitration, or to otherwise negotiate about or accept any dispute resolution method. A standalone arbitration agreement would be "markedly dissimilar" (*Moore v. California State Bd. of Accountancy*, *supra*, 2 Cal.4th at p. 1012) from agreements about who provides medical care or what care they provide. Thus, defining the term "health care decision" to include a standalone arbitration agreement would not be "in concert with" (*Winn v. Pioneer Medical Group, Inc.*, *supra*, 63 Cal.4th at p. 159) the items listed and, therefore, with the apparent intent evidenced by the definitional provisions of Logan's power of attorney or the Health Care Decisions Law it invokes.

## 2. *Further Context*

Other portions of Logan's power of attorney, as well as the Health Care Decisions Law and the Probate Code, support this interpretation of the term "health care decision." (See *People v. Braden*, *supra*, 14 Cal.5th at p. 841 [" ' " ' "[W]e consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' " ' "]; *Hartford Casualty Ins. Co. v. Swift Distribution, Inc.*, *supra*, 59 Cal.4th at p. 288 [we interpret the language of a written instrument "in context"].)

We start with the Health Care Decisions Law's enacted legislative findings. The Legislature couched the law as recognizing "the dignity and privacy a person has a right to expect" and the "fundamental right to control the decisions relating to [one's] own health care, including the decision to have

11

life-sustaining treatment withheld or withdrawn." (§ 4650, subd. (a).) The Legislature referenced "[m]odern medical technology" and the "artificial prolongation of human life" while noting the need to protect "individual autonomy" and the "dignity" of patients facing end of life scenarios. (*Id.*, subd. (b).) These findings reflect that the Health Care Decision Law's roots trace back to California's pioneering "living will" statute, passed in 1976, and the principle that advanced health care directives are intended to ensure a patient's consent to medical treatment. (See Sabatino, *The Evolution of Health Care Advance Planning Law and Policy* (2010) vol. 88, No. 2, 16 Millbank Q., 212–214.) These findings also align with a view of health care decisions as personal, private, and about treatment. This tends to suggest that neither the Legislature nor Logan would have viewed decisions well beyond this ambit — such as whether to select optional arbitration — as health care decisions.

In addition, explanatory language within the Health Care Decisions Law's optional form for advance health care directives and within Logan's power of attorney both point in the same direction as the legislative findings. The statutory form begins by explaining to the potential principal, "You have the right to give instructions about your own physical and mental health care. You also have the right to name someone else to make those health care decisions for you. This form lets you do either or both of these things. It also lets you express your wishes regarding donation of organs and the designation of your primary physician." (§ 4701.) The form goes on to state that an agent whose health care decisionmaking power is not otherwise limited may make decisions about health care and about disposition of remains and autopsies after death, mirroring the language of sections 4617 and 4683. (§ 4701.) The form's actual

grant of health care decisionmaking authority states, "My agent is authorized to make all physical and mental health care decisions for me, including decisions to provide, withhold, or withdraw artificial nutrition and hydration and all other forms of health care to keep me alive, except as I state here:" (*Ibid.*) The form thus equates health care decisions with "instructions about [the principal's] physical and mental health care." The California Medical Association form that Logan used contained similarly limited explanatory language: "This form lets you give instructions about your future health care. . . . Your agent must make health care decisions that are consistent with the instructions in this document and your known desires. It is important that you discuss your health care desires with the person(s) you appoint as your health care agent, and with your doctor(s)." Notably absent from the form and Logan's power of attorney is any suggestion that an appointed health care agent is authorized to make decisions concerning dispute resolution.

In assessing what a health care decision includes, it is also helpful to consider what the Legislature appears to have viewed as *not* amounting to such decisions. For example, the Health Care Decisions Law distinguishes health care decisions (see § 4617) from "decisions relating to personal care," which a principal may optionally delegate in a power of attorney for health care (§ 4671, subd. (b)). Personal care decisions include "determining where the principal will live, providing meals, hiring household employees, providing transportation, handling mail, and arranging recreation and entertainment." (*Ibid.*) The statute further contrasts the making of health care decisions with the nomination of a conservator of the person or estate. (§ 4672.) And although a power of attorney for health care may, as Logan's does, permit an agent to make "decisions that may be

effective after the principal's death" — including directing the disposition of remains, an autopsy, or the release of records — these decisions, too, are set forth outside the statutory definition of health care decisions. (§ 4617; see §§ 4678, 4683.) That the Health Care Decisions Law specifically permits delegation of some arguably collateral decisions, such as those pertaining to medical records or disposition of remains, suggests other, unspecified decisions — such as a separate, optional decision regarding dispute resolution — fall outside the bounds of what legislators and principals to a power of attorney for health care would consider a health care decision.

The definition of powers under the Health Care Decisions Law (contained in Division 4.7 of the Probate Code) contrasts with the definition of powers under the Uniform Statutory Form Power of Attorney Act, a subsidiary of the Power of Attorney Law (both contained in Division 4.5 of the Probate Code). The Power of Attorney Law governs powers of attorney "with respect to all lawful subjects and purposes" (§ 4000 et seq.; see § 4123) and the Uniform Statutory Form Power of Attorney Act streamlines creation of such documents, enabling easy delegation of statutorily defined powers (§ 4400 et seq.; see §§ 4401, 4450–4463). We should be attuned to differences in laws that are statutory neighbors and have, as shall be explained, provisions that share history or interrelate. (See *Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1108 [" ' "where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes" ' "]; *Wells v. One2One Learning Foundation* (2006) 39

Cal.4th 1164, 1190 ["specific enumeration . . . in one context, but not in the other, weighs heavily"]; see also *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 144 ["we interpret statutory language . . . in light of . . . analogous provisions" and in "the context of its neighboring provisions"].)

The Power of Attorney Law, the Uniform Statutory Form Power of Attorney Act, and the predecessor to the Health Care Decisions Law — which governed durable powers of attorney for health care decisionmaking[6] — were codified by a single, integrated enactment in 1994. (Stats. 1994, ch. 307, § 16, pp. 1983–2038; see Legis. Counsel's Dig., Sen. Bill No. 1907 (1993–1994 Reg. Sess.) 5 Stats. 1994, Summary Dig., p. 117.) The bill enacting the Health Care Decisions Law in 1999, which revised

---

[6]  The 1994 law governing durable powers of attorney for health care empowered designated attorneys in fact to make health care decisions, defined, then, as "consent, refusal of consent, or withdrawal of consent to health care, or a decision to begin, continue, increase, limit, discontinue, or not to begin any health care." (former § 4612.) The Law Revision Commission comments accompanying the Health Care Decisions Law stated that new section 4617, defining "health care decision" under the current law, "supersedes former Section 4612 and is the same in substance as Section 1(6) of the Uniform Health-Care Decisions Act (1993), with the substitution of the reference to cardiopulmonary resuscitation . . . for the uniform act reference to orders not to resuscitate. Adoption of the uniform act formulation is not intended to limit the scope of health care decisions applicable under former law. Thus, like former law, this section encompasses consent, refusal of consent, or withdrawal of consent to health care, or a decision to begin, continue, increase, limit, discontinue, or not to begin any health care. Depending on the circumstances, a health care decision may range from a decision concerning one specific treatment through an extended course of treatment, as determined by applicable standards of medical practice."

and recast the 1994 provisions authorizing durable powers of attorney for health care, acknowledged the Power of Attorney Law and the Uniform Statutory Form Power of Attorney Act, referencing both in making "related and conforming changes." (See Stats. 1999, ch. 658, §§ 27–36, pp. 4853–4856; see Legis. Counsel's Dig., Assem. Bill No. 891 (1999–2000 Reg. Sess.) 5 Stats. 1999, Summary Dig., p. 296.)

The Uniform Statutory Form Power of Attorney Act offers a form that lists categories of statutorily defined powers that a principal may choose to delegate. (§§ 4400, 4401, 4450–4463.) By placing initials next to a listed, pre-defined power, the principal may authorize an agent to act in "any lawful way with respect to the . . . initialed subjects," which include real or personal property transactions, banking transactions, business operating transactions, beneficiary transactions, claims and litigation, or personal and family maintenance. (§ 4401.) The preamble to the form states, "THIS DOCUMENT DOES NOT AUTHORIZE ANYONE TO MAKE MEDICAL AND OTHER HEALTH-CARE DECISIONS FOR YOU." (§ 4401; see Stats. 1994, ch. 307, § 16.) This admonition dovetails with the Legislature's prescription that the Power of Attorney Law applies to "statutory form powers of attorney" but not to "powers of attorney for health care" under the Health Care Decisions Law. (§ 4050, subd. (a)(1)–(2); see Stats. 1999, ch. 658, § 27, p. 4853.)

Looking at the definitions of the powers selectable under the Uniform Statutory Form Power of Attorney Act — powers the statute distinguishes from health care decisions — there are notable inclusions. For instance, the power to make decisions about "personal and family maintenance" includes the power to "[p]ay for . . . necessary medical, dental, and surgical care,

hospitalization, and custodial care." (§ 4460, subd. (a)(3).) The power to make decisions about "claims and litigation," moreover, includes the power to "submit to arbitration . . . with respect to a claim or litigation" and to "execute and file or deliver a . . . waiver, . . . agreement, or other instrument in connection with the prosecution, settlement, or defense of a claim or litigation." (§ 4459, subds. (d), (e).) Additionally, for each power granted in a statutory form power of attorney — be it a power over personal maintenance or other matters — the agent is separately authorized, in exercising power for that subject, to do a variety of things, including to "[p]rosecute, defend, submit to arbitration, settle, and propose or accept a compromise with respect to, a claim existing in favor or against the principal," and to "do any other lawful act with respect to the subject." (§ 4450, subds. (b), (d), (j).)

Comparing the Health Care Decisions Law and the Uniform Statutory Form Power of Attorney Act is instructive in several ways. We first note the Legislature's specific references in the Uniform Statutory Form Power of Attorney Act to an agent's power to settle claims or submit claims to arbitration. Such references are absent from the Health Care Decisions Law. The "specific enumeration" of these powers in the power-defining provisions of the Uniform Statutory Form Power of Attorney Act "weighs heavily against" implying similar or related powers in the context of a health care decision defined under the Health Care Decisions Law. (See *Wells v. One2One Learning Foundation, supra*, 39 Cal.4th at p. 1190.) We next note the Uniform Statutory Form Power of Attorney Act expressly acknowledges a distinction between the decisions it authorizes, such as those related to claims and litigation, and health care decisions. In particular, the warning atop the

traditional power of attorney form cautions, in block capital letters, that it does not authorize health care decisions. (§ 4401.)

Furthermore, in discerning the scope of the term "health care decision," as envisioned by the Legislature and, in turn, Logan's power of attorney, our precedent instructs we should not only address the differences in the various Probate Code provisions, but strive to harmonize them, avoiding anomalies. (*First Student Cases* (2018) 5 Cal.5th 1026, 1035 ["We construe statutory language in the context of the statutory framework, seeking to discern the statute's underlying purpose and to harmonize its different components"].) Defining health care decisions as including decisions about dispute resolution that are not necessary for health care might create unnecessary tension between the two regimes for powers of attorney and between agents designated under them. Doing so, for example, could undermine the expectations of a principal who designates one agent to make health care decisions and another agent, under the form power of attorney, to make decisions about claims and litigation. A principal executing both form powers of attorney found in sections 4401 and 4701 could readily view health care decisions as separate from decisions involving claims and litigation, because the forms expressly make this distinction. In that case, the principal might expect and prefer the agent in charge of claims and litigation to accept or reject optional arbitration agreements. A broad construction of the term health care decision might, therefore, and contrary to the principal's expectations, "override" a grant of power over claims and litigation decisions. (See *Johnson v. Kindred Healthcare, Inc.* (Mass. 2014) 2 N.E.3d 849, 856, 859 [reaching a similar

conclusion under Massachusetts law].)[7]  On the other hand, if arbitration is, as here, not a condition of treatment, a health care agent's lack of authority to enter arbitration agreements would not deprive a principal of health care.  (Cf. *Owens v. Nat'l Health Corp.* (Tenn. 2007) 263 S.W.3d 876, 885 [raising this concern regarding arbitration agreements included in a contract required for admission].)

Moreover, interpreting the term "health care decision" to exclude optional and separate agreements to arbitrate fits best with the Legislature's decision to use that term in the Health Care Decisions Law to describe the scope of authority not only for those (like Harrod) who act pursuant to powers of attorney for health care, but also for surrogates, including next of kin or close friends.  These surrogates may be selected by the patient in haste upon entering a facility (§ 4711)[8] or selected for the patient by a provider or facility when there is no recognized

---

[7]    In line with this observation, we disapprove dicta in *Hutcheson v. Eskaton FountainWood Lodge* (2017) 17 Cal.App.5th 937, 956–957, suggesting a person empowered to make decisions about all a principal's claims and litigation lacks authority to do so when the party across the contracting table is a health care facility or provider.  We have no occasion to address *Hutcheson*'s ultimate concern: whether an agent with power over claims and litigation, but without power over health care decisions, may agree to arbitration with a health care facility with whom the agent had no right to contract for services in the first instance.  (See *id.* at p. 957.)

[8]    "A patient may designate an adult as a surrogate to make health care decisions by personally informing the supervising health care provider or a designee of the health care facility caring for the patient.  The designation of a surrogate shall be promptly recorded in the patient's health care record." (§ 4711, subd. (a).)

health care decisionmaker (§ 4712).[9] One of the purposes of the Health Care Decisions Law was to "set[] out uniform standards for the making of health care decisions by third parties," whether by conservators, agents, or surrogates. (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 539–540; see § 4617 [defining a health care decision as one "made by a patient or the patient's agent, conservator, or surrogate"].)

Before the Health Care Decision Law's enactment, Health and Safety Code section 1418.8 addressed the ability of next of kin to represent residents in skilled nursing facilities or intermediate care facilities who lacked capacity to make health care decisions. (Health & Saf. Code, § 1418.8; see Stats 1992 ch. 1303, § 1, pp. 6326–6328.) Under that provision, when "there is no person with legal authority to make . . . decisions concerning [a] resident's health care," an attending physician at the facility, after following certain procedures, may pursue an intervention that would otherwise require informed consent. (Health & Saf. Code, § 1418.8, subd. (a).) A person with legal authority to make these decisions includes a "next of kin." (*Id.*, subd. (c).) Our appellate courts have held that next of kin, whether empowered to make medical decisions either under this statute or through principles of ostensible agency, lack authority to enter separate, optional arbitration agreements with nursing facilities. (*Pagarigan v. Libby Care Center, Inc.* (2002) 99 Cal.App.4th 298, 302 [applying Health & Saf. Code, § 1418.8 and concluding "Defendants do not explain how the next of kin's authority to

_____

[9] Under specified conditions, "a health care provider or a designee of the health care facility caring for the patient may choose a surrogate to make health care decisions on the patient's behalf, as appropriate in the given situation." (§ 4712, subd. (b).)

make medical treatment decisions for the patient at the request of the treating physician translates into authority to sign an arbitration agreement on the patient's behalf at the request of the nursing home"]; *Goliger v. AMS Properties, Inc.* (2004) 123 Cal.App.4th 374, 377 [applying ostensible agency to reach a similar conclusion]; *Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 594 [applying Health & Saf. Code, § 1418.8 and concluding "Unlike admission decisions and medical care decisions, the decision whether to agree to an arbitration provision in a nursing home contract is not a necessary decision that must be made to preserve a person's well-being. Rather, an arbitration agreement pertains to the patient's legal rights, and results in a waiver of the right to a jury trial"].)

The Health Care Decisions Law built on Health and Safety Code section 1418.8, and it expressly allows a health care provider or health care facility designee to appoint, as needed, next of kin and other close family or friends as surrogates.[10]

---

[10] The uniform act underlying California's Health Care Decisions Law and the initial draft of California's law would have allowed next of kin to become surrogates. (2000 Health Care Decisions Law and Revised Power of Attorney Law (Mar. 2000) 30 Cal. Law Revision Com. Rep. (2000) pp. 25–31.) That draft of the law, as noted in Law Revision Commission's report, would have expanded the "next of kin" provision applicable to medical treatment decisions in nursing homes to health care decisions in other contexts. (2000 Health Care Decisions Law and Revised Power of Attorney Law, at p. 18.) But legislators could not agree, at that time, on the provisions governing who could become a surrogate in the absence of any choice by the patient or action by a court. (See 1 Zimring & Bashaw, Cal. Guide to Tax, Estate & Financial Planning for the Elderly (2023)

(§ 4712, added by Stats. 2022, ch. 782, § 2; 2000 Health Care Decisions Law and Revised Power of Attorney Law, *supra*, 30 Cal. Law Revision Com. Rep. at p. 18.) Thus today, the health care decisionmaker for an incapacitated patient is, first, a patient-selected surrogate, second, a patient's "agent pursuant to an advance health care directive or a power of attorney for health care," third, a "conservator or guardian of the patient having the authority to make health care decisions for the patient," and, fourth, a close family member or friend designated by a health care provider or facility. (§ 4712, subds. (a), (b); see also § 4643 [" 'Surrogate' means an adult, other than a patient's agent or conservator, authorized under this division to make a health care decision for the patient"].)

The Legislature's decision to invest in each of these four categories of representatives the authority to make "health care decisions" further suggests, whether or not the power of each type of representative is fully equivalent, that the Legislature intended the authority to make health care decisions to concern matters more closely related to health care. The authority to make health care decisions may devolve upon not only agents carefully selected in advance, but also on surrogates the principal chooses in emergency situations or even those the health care provider chooses itself. Because the statute gives both agents and as-needed surrogates authority to make health care decisions, that authority, when exercised pursuant to a power of attorney such as Logan's, is not best understood as

§ 3.04.) Initially, then, the law simply allowed patients to designate or disqualify surrogates, but did not set forth a process for how next of kin might be selected for this role. (Former §§ 4711, 4715.)

relating to every possible aspect of a transaction with a skilled nursing facility, such as optional, separate agreements that do not affect health care or the selection of the facility.[11]

## B. Agency Law

Defendants, the facility owners and operators, contend Civil Code section 2319, part of our state's law of agency, imbued Logan's health care decisionmaking agent with authority to agree to arbitration. As noted above, where the Health Care Decisions Law "does not provide a rule governing agents under powers of attorney, the law of agency applies." (§ 4688.) Since 1872, section 2319 of the Civil Code has conferred an agent with authority "[t]o do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency." (Civ. Code, § 2319, subd. (1).)

Defendants assert selecting arbitration for dispute resolution is a "proper and usual" act for someone otherwise empowered to make health care decisions and to contract with a health care provider. Civil Code section 2319, in defendants' view, either provides guidance on the scope of "health care decisions" otherwise missing from the Health Care Decisions Law or counteracts any narrow construction of "health care

---

[11] We may consult other indicia of legislative intent, including legislative history or public policy, to derive a statute's meaning if statutory language, read in context, "permits more than one reasonable interpretation." (*People v. Braden, supra*, 14 Cal.5th at p. 804.) Here, neither defendants nor their supporting amici curiae identify legislative history that casts doubt on our proposed construction of "health care decision." Nor do their policy arguments about the general cost-savings benefits of arbitration convince us to " 'strain to discern (because we are not free to impose)' " a different meaning. (*Bernard v. Foley* (2006) 39 Cal.4th 794, 814.)

decision" otherwise inherent in that law or Logan's power of attorney. Harrod disagrees, asserting there are no gaps in the Health Care Decisions Law and there is nothing about an optional, separate arbitration agreement that effectuates the purpose of health care decisionmaking and Harrod's agency. Harrod's view is closer to the mark.

Civil Code section 2319 embodies the notion of implied authority — that an agent expressly granted a specific power should have sufficient authority to effectuate it. (See *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 706 (*Madden*) *Robbins v. Pacific Eastern Corp.* (1937) 8 Cal.2d 241, 285.) This rule is a longstanding feature of agency law. (Story, Commentaries on the Law of Agency, as a Branch of Commercial and Maritime Jurisprudence, with Occasional Illustrations From the Civil and Foreign Law (8th ed., 1874) § 58, p. 71 (Story on Agency); Reynolds, Bowstead & Reynolds on Agency (17th ed. 2001) ¶¶ 3–018, 3–019, p. 102; 1 Mechem, A Treatise on the Law of Agency (2d ed. 1914) § 715, p. 502; Rest.3d Agency, § 2.02, com. d and reporter's note d.) The assumption is "the principal does not wish to authorize what cannot be achieved if necessary steps are not taken by the agent, and that the principal's manifestation often will not specify all steps necessary to translate it into action." (Rest.3d Agency, § 2.02, com. d.)

The nature of the task delegated in a power of attorney itself provides a limit on the powers to be implied. An agent operating under a power of attorney may not "go beyond it nor beside it, though it is competent for [the agent] to perform all such subordinate acts as are usually incident to or necessary to effectuate the object expressed. In order to bind the principal in such case, it must appear that the act done by the agent was in the exercise of the power delegated, and within its limits."

24

(*Blum v. Robertson*, *supra*, 24 Cal. at p. 140.) Put another way, an implied power "must be within the ultimate objective of the principal . . . .'" (*Garber v. Prudential Ins. Co.* (1962) 203 Cal.App.2d 693, 701–702, quoting Rest.2d Agency, § 229, com. B, p. 508.) The question is "whether the agent was engaged strictly in an endeavor to bring about a result for which his services were engaged." (*Garber*, at p. 703.) "[G]eneral words in powers of attorney are always limited by the express purposes of the power" such that we have said if an agency may be "fully performed without" an unenumerated power, that power will not be viewed as within the agent's purview. (*Palomo v. State Bar* (1984) 36 Cal.3d 785, 794 & fn. 5.) To be implied, a power would have to be "in pursuit of 'the said services' " identified in the power of attorney. (*Ibid.*)

In *Madden*, a case defendants view as dispositive to our agency analysis, we addressed the intersection of implied agency, contracting for medical services, and arbitration. We asked "whether an agent or representative, contracting for medical services on behalf of a group of employees, has implied authority to agree to arbitration of malpractice claims of enrolled employees arising under the contract." (*Madden*, *supra*, 17 Cal.3d at p. 702.) We first noted that the Government Code authorized a state retirement board "to negotiate contracts for group medical plans for state employees" (*id.* at p. 705) and required inclusion of "a grievance procedure to protect the rights of the employees" (*id.* at p. 704). We concluded the board acted as the agent of employees when negotiating contract terms within the scope of its authority. (*Id.* at pp. 705–706; see Gov. Code, § 22793 [empowering the board to contract for health benefit plans].) Thus, the board could, under Civil Code section 2319, agree to things "proper and usual" to further that purpose.

(*Madden*, at p. 706.)  We then held that arbitration is a " 'proper and usual' means of resolving malpractice disputes" and that the board, as an agent "empowered to negotiate a group medical contract" for the state employees, could agree to an arbitration clause.  (*Id.* at p. 706.)

*Madden* is distinguishable.[12]  There, a state board had express power, pursuant to statute, to "negotiate contracts for group medical plans" that included a "grievance procedure." Therefore, the state board, under agency law, could adopt proper and usual means in pursuit of this contracting authority, including choosing proper and usual terms for dispute resolution, such as arbitration.  In contrast to the statutory grant of authority in *Madden*, the grant of power to Harrod in this case, under a power of attorney for health care, did not mention the power to broadly negotiate contracts or select a

---

[12]  Nor does the case *Madden* draws upon in explaining its result, *Doyle v. Giuliucci* (1965) 62 Cal.2d 606, assist defendants.  (See *Madden*, *supra*, 17 Cal.3d at p. 708.)  *Doyle* concluded that a parent's power to enter into a contract for medical services on behalf of a child allows the parent to bind the child to an arbitration provision included within that contract.  (*Doyle,* at pp. 607, 610.)  No one contends that the nephew-uncle relationship between Harrod and Logan is akin to the parent-child relationship in *Doyle*, or that it implicates the "right and duty" of parents, codified by statute, "to provide for the care of [their] child."  (*Doyle*, at p. 610, citing Civil Code, former § 196, and Penal Code, § 270; see Fam. Code, § 3900.) *Doyle* did not evaluate the meaning of a "health care decision" that could be made by an agent, surrogate, or conservator, absent such a special familial relationship.  Nothing we say here addresses whether any particular familial relationship would itself convey authority to agree to arbitration with a skilled nursing facility.

dispute resolution method. Rather, it merely granted Harrod the authority to make "health care decisions."

If, under *Madden*, selecting arbitration as a contract term serves the purpose of statutorily authorized contract negotiation, choosing a dispute resolution method does not similarly serve the purpose of making "health care decisions" when that choice is contained in a side agreement with no impact on health care or who administers it. The authority to make health care decisions — here, the authority to obtain skilled nursing care — could be "fully performed" without reference to that side agreement. (*Palomo v. State Bar*, *supra*, 36 Cal.3d at p. 794 & fn. 5.) And accepting or rejecting that side agreement could not be said to be "in pursuit of" (*ibid.*) or to "effectuate" (*Blum v. Robertson*, *supra*, 24 Cal. at p. 140) a health care decision. "The power" bestowed upon an agent "is to be construed with reference to the subject-matter, and all the words used in conferring it . . . ." (*Beckman v. Wilson* (1882) 61 Cal. 335, 336.) Thus, to the extent general agency principles might aid us here in divining the scope of a health care decision (see § 4688), we employ them consistently with what we have gleaned from examining the Health Care Decisions Law and Logan's power of attorney on this subject. We remain mindful that the Legislature, and in turn Logan, contemplated a "health care decision" would concern personal decisions such as provider and treatment selection.

Despite the different grants of authority at issue in *Madden* and in cases involving the Health Care Decisions Law, several Courts of Appeal have read *Madden* as supporting defendants' position that the power to make health care decisions, under the law and powers of attorney invoking it, does include the power to enter optional, separate arbitration

agreements with health care providers. (*Garrison v. Superior Court, supra,* 132 Cal.App.4th at p. 267; *Hogan v. Country Villa Health Services, supra,* 148 Cal.App.4th at p. 267.) But having reviewed the deep-seated agency principles governing implied powers under powers of attorney and the *Madden* decision, and having recognized the difference between the power to contract delegated in *Madden* and the power to make health care decisions delegated here, these Courts of Appeal appear to have taken *Madden* farther than it and the law of agency should go in this context.[13] (See *Logan v. Country Oaks Partners, LLC,*

---

[13] *Garrison,* and *Hogan* after it, cite other provisions of the Health Care Decisions Law to support the result they reach, noting a "combined effect" with the implied agency principles of Civil Code section 2319. (*Garrison, supra,* 132 Cal.App.4th at pp. 265–267; *Hogan, supra,* 148 Cal.App.4th at pp. 265–267.) But those other provisions do not bear on whether an agreement to arbitrate is a health care decision. Probate Code section 4683, subdivision (a), merely states an agent for health care decisions may make them "to the same extent the principal could make" them. This offers no definition of the critical term. Subdivision (b) of that section allows an agent under a power of attorney for health care to make decisions "that may be effective after death." But this, too, offers no guidance. Arbitration is hardly best categorized as a decision effective after death. After all, an agent would typically agree to arbitrate health care disputes while the principal is still alive and in need of care, an arbitration over health care might well take place while the principal is still alive, and, as discussed (at p. 12, *ante*), under the Health Care Decisions Law, these post-death decisions are categorized separately from health care decisions and are exemplified by approving organ donation, autopsies, disposition of remains, and records releases — not matters such as arbitration. Finally, Probate Code section 4684, in requiring an agent to "make . . . health care decision[s] in accordance with a principal's individual health care instructions" or known wishes,

*supra*, 82 Cal.App.5th at p. 373 ["The holding in *Madden* is inapplicable" as "[t]here is nothing . . . 'necessary or proper and usual' about signing an optional arbitration agreement 'for effecting the purpose of [the] agency,' i.e., placing [the principal] into a skilled nursing facility"]; cf. *Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1129 ["to the extent" *Garrison* broadly interpreted "health care decision" as including an arbitration decision, "we disagree with its conclusion"].) We therefore cannot, and do not, equate all agreements between a patient and a health care facility, regardless of their circumstances and their relation to obtaining health care, with health care decisions.[14]

Having considered the meaning of a "health care decision" within Logan's power of attorney, in light of the Health Care

_____

or otherwise, "in accordance with the agent's determination of the principal's best interest," likewise does not resolve the matter. It states how health care decisions should be made, not what they encompass.

[14] *Hogan*, *supra*, 148 Cal.App.4th at p. 267, is correct that Health and Safety Code section 1599.81, which prohibits arbitration agreements from being a precondition to facility admission, plainly contemplates that patients and long-term health care facilities will enter into arbitration agreements. (Cf. 42 C.F.R. § 483.70(n) [imposing a similar rule on facilities participating in Medicare and Medicaid].) Although section 1599.81 suggests the Legislature views arbitration agreements as permissible in this context, it does not suggest the Legislature viewed these arbitration agreements as health care decisions or as effectuating such decisions, especially when presented as unnecessary to a patient's admission. Nor does the statute tell us *who* the Legislature thought should have authority to agree to arbitration. The statute and related federal regulations show, if anything, a view of arbitration agreements as distinct from decisions critical to receiving health care.

Decisions Law and the Probate Code, we conclude that the most reasonable construction of that term excludes the optional, separate arbitration agreement with defendants. Resort to agency law bolsters, rather than undermines, this conclusion.[15]

---

[15] In doing so, we align California with the published opinions of numerous other state courts that — after reviewing powers of attorney formed under state statutes akin to the Health Care Decisions Law — conclude an agreement to arbitrate, particularly when optional and separate, is not a health care decision within an agent's power. (*Coleman v. United Health Services of Ga.* (Ga.Ct.App. 2018) 812 S.E.2d 24, 26; *Parker v. Symphony of Evanston Healthcare, LLC* (Ill.App.Ct. 2023) 220 N.E.3d 455, 463; *Ping v. Beverly Enters.* (Ky. 2012) 376 S.W.3d 581, 592, 594; *Johnson v. Kindred Healthcare, Inc., supra,* 2 N.E.3d at pp. 851–859; *Dickerson v. Longoria* (Md. 2010) 995 A.2d 721, 731, 736–739; *Primmer v. Healthcare Indus. Corp.* (Ohio Ct.App. 2015) 43 N.E.3d 788, 789, 795; *Williams v. Smyrna Residential, LLC* (Tenn., Feb. 16, 2024, M2021-00927-SC-R11-CV) __ S.E.2d __ [2024 Tenn. LEXIS 44, at *18]; *Tex. Cityview Care Ctr., L.P. v. Fryer* (Tex.Ct.App. 2007) 227 S.W.3d 345, 349, 352–353; *Miller v. Life Care Ctrs. of Am., Inc.* (Wyo. 2020) 478 P.3d 164, 166–167, 172–173; cf. *Koricic v. Beverly Enters.– Neb., Inc.* (Neb. 2009) 773 N.W.2d 145, 151 [agent with authority arising from practice of signing medical documents was not empowered to execute optional arbitration agreement]; *Arredondo v. SNH SE Ashley River Tenant, LLC* (S.C. 2021) 856 S.E.2d 550, 557–558 [optional arbitration agreement was not "necessary" to making health care decisions]; *Lujan v. Life Care Centers of Am.* (Colo.Ct.App. 2009) 222 P.3d 970, 973 [statutory surrogate for health care decisions could not agree to optional arbitration]; *Blankfeld v. Richmond Health Care, Inc.* (Fla.Dist.Ct.App. 2005) 902 So.2d 296 [same]; *Mississippi Care Ctr. of Greenville, LLC v. Hinyub* (Miss. 2008) 975 So. 2d 211, 218 [same]; *Gayle v Regeis Care Ctr., LLC* (N.Y.App.Div. 2021) 191 A.D.3d 598, 599–600 [same]; *State ex rel. AMFM, LLC v. King* (W.Va. 2013) 740 S.E.2d 66, 72 [same].) One published opinion appears to take the opposite approach to

## C.    *Kindred*

Defendants argue if we interpret, as we have, the term "health care decision" in Logan's power of attorney to exclude the decision to accept an optional, separate arbitration agreement, that decision would so disfavor arbitration as to violate the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) and, in particular, the high court's decision in *Kindred Nursing Centers. L.P. v. Clark* (2017) 581 U.S. 246, 250 (*Kindred*).)  We disagree.

---

powers of attorney and optional arbitration agreements. (*Moffett v. Life Care Ctrs. of Am.* (Colo.Ct.App. 2008) 187 P.3d 1140, 1141–1142, 1147 [concluding the holder of a medical durable power of attorney may, in selecting a long-term health care facility, execute "applicable admissions forms" including an optional arbitration agreement, but also noting that holder had powers under a general power of attorney, and both powers of attorney, which were not in the record, would need to be reviewed on remand to see if they curtailed arbitration authority], affirmed on other ground in *Moffett v. Life Care Ctrs. of America* (Colo. 2009) 219 P.3d 1068, 1071 [declining to reach "whether a person holding a medical durable power of attorney is authorized to sign an arbitration agreement on behalf of an incapacitated patient"].)  A few others have reached a different result based on powers of attorney with broader or different language.  (E.g., *Ingram v. Chateau* (Mo. 2019) 586 S.W.3d 772, 776 [because a voluntary arbitration agreement "was presented in connection with Ingram's admission to Brook Chateau, there was no reason for Hall to doubt she had the authority to sign it on Ingram's behalf as part of her express 'full authority' " under a power of attorney to "move" Ingram into a residential care facility].)

Ultimately, the majority view better aligns with Logan's power of attorney, the arbitration agreement here, and California's Health Care Decisions Law and its law of agency.

Congress enacted the FAA "in response to judicial hostility to arbitration. Section 2 of the statute, by making arbitration agreements 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract,'" establishes an " 'an equal-treatment principle: A court may invalidate an arbitration agreement based on "generally applicable contract defenses" like fraud or unconscionability, but not on legal rules that "apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." ' " (*Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639, 649–650, quoting 9 U. S. C., § 2, and *Kindred*, *supra*, 581 U.S. at p. 251.) When the FAA applies — that is, when the contracting parties are sufficiently involved in interstate commerce (see *Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265) — the FAA "preempts any state rule discriminating on its face against arbitration" and "displaces any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements." (*Kindred*, at p. 251.)

In *Kindred*, Kentucky's Supreme Court had invalidated two agent-signed arbitration agreements — in one instance, where a power of attorney was plainly broad enough to give the agent the power to sign, and in another instance, where this was not so. (*Kindred*, *supra*, 581 U.S. at p. 250.) Regarding the broader power of attorney, the state court held "an agent could deprive her principal of an 'adjudication by judge or jury' only if the power of attorney 'expressly so provide[d],'" which it had not. (*Ibid.*) In so holding, the state court emphasized the "sacred," "inviolate" nature of the jury-trial right. (*Id.* at p. 252.) The high court held that the FAA preempted this "clear-

statement rule." (*Kindred*, *supra*, 581 U.S. at pp. 251–254.) This rule, the high court reasoned, "hing[ed] on the primary characteristic of an arbitration agreement — namely, a waiver of the right to go to court and receive a jury trial." (*Id.* at p. 252.) The high court found it telling that no other Kentucky court had identified any other " 'fundamental constitutional rights' held by a principal" that, to be waived, required an explicit grant of authority in a power of attorney. (*Id.* at p. 253.) As for the Kentucky Supreme Court's conjecture that its clear-statement rule might require a principal's explicit authorizations for an agent to intrude on certain other fundamental rights — such as by waiving a right to worship freely, or by arranging a principal's marriage or binding the principal to servitude — the high court called such examples "patently objectionable and utterly fanciful." (*Id.* at p. 253.) It concluded that placing the choice to arbitrate alongside these other decisions evidenced an impermissible " 'hostility to arbitration' " because of its nature. (*Id.* at p. 254.) Accordingly, the high court reversed the Kentucky Supreme Court as to the broad power of attorney and ordered arbitration. Regarding the narrower power of attorney, however, the high court remanded, reasoning that if the interpretation of the narrower power of attorney was "wholly independent of the . . . clear-statement rule, then nothing we have said disturbs it."[16] (*Kindred*, *supra*, 581 U.S. at p. 256.)

Assuming the FAA applies here, *Kindred* does not "disturb" our conclusions regarding the scope of a health care

---

[16]  On remand, the Kentucky Supreme Court determined the clear-statement rule had played no role in its decision and left its previous decision, denying arbitration, in place. (*Kindred Nursing Centers L.P. v. Wellner* (Ky. 2017) 533 S.W.3d 189, 194.)

agent's powers. For instance, we have not revisited the holding in *Madden, supra*, 17 Cal.3d at page 706, that arbitration, if agreed to, is a " 'proper and usual' means of resolving malpractice disputes." A principal or any properly authorized agent may, under *Madden*, agree to arbitration. What we conclude is that a "health care decision," under our Health Care Decisions Law and Logan's power of attorney for health care, excludes an optional, separate agreement that does not accomplish health care objectives. This outcome does not emerge from or reflect hostility towards arbitration. Nor does it depend on a clear-statement rule. Rather, it derives from the scope of the health care decisionmaking power Logan granted to Harrod — as determined from generally applicable legal principles — and the conclusion that agreeing to an optional, separate arbitration agreement with a skilled nursing facility is not a health care decision. (See *Garcia v. KND Development 52, LLC* (2020) 58 Cal.App.5th 736, 747 [discussing *Kindred*'s inapplicability when court relied on "generally applicable law"].) Logan himself could have agreed to arbitration, whether before or after any dispute arose. Likewise, any agent of Logan operating under a broader power of attorney, whether that power of attorney contained a clear statement of the power to agree to arbitration or utilized more general language encompassing that power, might have bound Logan to arbitrate. Logan's power of attorney here, however, did not make Harrod such an agent.

## III.  DISPOSITION

We affirm the judgment of the Court of Appeal.[17]

                                              **JENKINS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**

---

[17]    We disapprove *Garrison v. Superior Court, supra,* 132 Cal.App.4th 253 and *Hogan v. Country Villa Health Services, supra,* 148 Cal.App.4th 259 to the extent they are inconsistent with this opinion.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Harrod v. Country Oaks Partners, LLC

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 82 Cal.App.5th 365
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S276545
**Date Filed:**  March 28, 2024

---

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Monica Bachner

---

**Counsel:**

Cole Pedroza, Kenneth R. Pedroza, Cassidy C. Davenport; Buchalter, Harry W.R. Chamberlain II, Robert M. Dato; Sun Mar Management Services, Trent Evans, Kevin Khachatryan, Julieta Y. Echeverria and Brittany A. Ortiz for Defendants and Appellants.

Tucker Ellis and Traci L. Shafroth for California Medical Association, California Dental Association and California Hospital Association as Amici Curiae on behalf of Defendants and Appellants.

Hooper, Lundy & Bookman, Mark E. Reagan and Jeffrey Lin for California Association of Health Facilities as Amicus Curiae on behalf of Defendants and Appellants.

Carroll, Kelly, Trotter & Franzen, David P. Pruett; and Fred J. Hiestand for the Association of Southern California Defense Counsel and the Civil Justice Association of California as Amici Curiae on behalf of Defendants and Appellants.

Lanzone Morgan, Ayman R. Mourad, Alexander S. Rynerson, Suzanne M. Voas; BraunHagey & Borden, Matthew Borden and Kory J. DeClark for Plaintiff and Respondent.

Stiller Law Firm and Ari J. Stiller for Consumer Attorneys of California, Compassion & Choices, American Association for Justice and Public Justice as Amici Curiae on behalf of Plaintiff and Respondent.

William Alvarado Rivera; and Eric M. Carlson for AARP, AARP Foundation, Justice in Aging, California Advocates for Nursing Home Reform, California Long-Term Care Ombudsman Association and The National Consumer Voice for Quality Long-Term Care as Amici Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Harry W.R. Chamberlain II
Buchalter, A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017
(213) 891-5115

Mark E. Reagan
Hooper, Lundy & Bookman, P.C.
44 Montgomery Street, Suite 3500
San Francisco, CA 94104
(415) 875-8501

Matthew Borden
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210